[Civ. No. 14088. First Dist., Div. One. Apr. 18, 1951.]

OIL WORKERS INTERNATIONAL UNION et al., Petitioners, v. SUPERIOR COURT OF CONTRA COSTA COUNTY et al., Respondents.

Edises, Treuhaft & Condon, Bertram Edises, Robert L. Condon, Lindsay P. Walden, A. L. Wirin and Fred Okrand for Petitioners.

Arthur J. Goldberg, Thomas E. Harris, Jay A. Darwin and Daniel Fogel, as Amici Curiae on behalf of Petitioners.

Brobeck, Phleger & Harrison, Robert E. Burns, Tinning & DeLap, Archibald B. Tinning and Robert Eshleman for Respondents.

WOOD (Fred B.), J.—This is a proceeding to review an order in which the superior court found that the petitioners herein had violated a temporary restraining order, and adjudged them in contempt of court therefor.

The petitioners are Oil Workers International Union, CIO, an unincorporated association (hereinafter called the International Union); Local 326 of Oil Workers International Union, CIO, an unincorporated association (hereinafter called the Local Union); J. P. Kenny, individually and as first vice-president of the Local Union; Frank M. Casey, individually and as financial secretary and business agent of the Local Union; Herman Phillips, Jr., Frank M. Silva, Harris E. Lakeman, Montell H. Bullock, Curtis C. Page, and Walter V. Holt.

The International and the Local Unions, Kenny, and Casey are defendants in the action in which the order under review was issued, an action brought by Union Oil Company of California to enjoin the commission of certain acts.

The verified complaint in that action, filed September 13, 1948, alleged that plaintiff operates at Oleum, Contra Costa County, a petroleum refinery, with two principal gates opposite each other and on either side of U. S. Highway No. 40 (one known as the main and the other as the Tormey entrance) and a number of subsidiary entrances; the refinery is also located on the main line of the Southern Pacific railroad, with four railroad entrances for the delivery of materials and shipment of products on spur tracks; it is necessary, in the conduct of the business, for plaintiff, the railway company and persons doing business with plaintiff to operate motor vehicles and trains into and out of the refinery; that the International

and the Local Unions represent persons employed in the production and processing of petroleum and petroleum products, including persons so employed by plaintiff; that defendant J. Elro Brown is an officer, agent and representative of the International and other named defendants are officers, agents and representatives of the Local Union; that on September 4, 1948, the unions called a strike at the refinery; that ever since then defendants and their agents, members and representatives have and now are picketing the refinery by standing and patrolling in front of the several entrances thereto,—at the main entrance from 10 to 80 pickets and at another entrance from 4 to 20 pickets, and from 2 to 13 at the railroad entrance whenever it appeared that railroad cars were likely to enter or leave; at times as many as 100 pickets congregated at the main and Tormey entrances and by their number intimidated from entering or leaving the refinery, officers, agents, and employees of plaintiff, and other persons desiring to enter or leave; when persons or vehicles attempted to enter or leave by the main or the Tormey entrance, the pickets have so placed themselves in front of the entrance as to physically obstruct the same and prevent such persons and vehicles from utilizing the entrance; on September 4, 1948, defendants caused their pickets to enter the refinery premises and place themselves upon the rail-track leading thereto in such manner as to obstruct the railroad entrance thereto and, despite plaintiff's demand to remove themselves, prevented the Southern Pacific Company from operating a train into the premises and caused the train to leave without picking up and removing 10 tank cars of petroleum products being shipped by plaintiff and thereby prevented plaintiff and ever since have prevented plaintiff from shipping said petroleum products; since September 4, 1948, for the purpose of unlawfully forcing plaintiff to accede to their demands, they have engaged in an unlawful scheme and conspiracy to molest, threaten, intimidate and coerce plaintiff, its agents, officers and employees, and the employees of Southern Pacific Company or other persons doing business with plaintiff, for the purpose of preventing the operation of the refinery, and of preventing plaintiff's officers, agents and employees working thereat and of preventing Southern Pacific Company and others from continuing to do business with plaintiff, and in pursuance of said purposes have obstructed the entrances and in the manner described have intimidated persons desiring to enter or leave the refinery; defendants threaten to and unless restrained by order of the

court will continue to so obstruct the entrances and intimidate persons desiring to enter or leave, who will be prevented by intimidation and physical blockade from entering or leaving; and plaintiff will thereby be irreparably damaged and prevented from carrying on its said business, from bringing materials to the refinery, and from shipping the products from the refinery; and prayed for judgment enjoining defendants and persons acting under them from carrying on said scheme and conspiracy and from engaging in or continuing any of the acts described, and for a temporary restraining order and an injunction pendente lite.

On September 13, 1948, in the action in the superior court, that court issued an order requiring the defendants therein to show cause why they should not be enjoined and restrained, during the pendency of the action, from directly or indirectly committing any of the following acts:

"1. Intimidating, obstructing, molesting, harrassing or threatening bodily harm or injury to plaintiff's officers, agents, employees, customers, or any other persons having business with plaintiff, or attempting to serve plaintiff, or the driver or operator of any vehicle, engine or train while entering, attempting to enter, leaving or attempting to leave plaintiff's refinery at Oleum, Contra Costa County, California.

"2. Obstructing in any manner any entrance of plaintiff's said refinery at Oleum, Contra Costa County, California, including any entrance used for ingress and egress to and from said refinery by pedestrains, motor vehicles, or railroad engines and trains.

"3. Congregating, gathering, massing, demonstrating, marching, picketing, standing, sitting, loitering, walking or stationing or maintaining any pickets or other persons at or near or in front of or within two hundred yards of any entrance of plaintiff's refinery at Oleum, Contra Costa County, California, except as hereinafter provided.

"4. Maintaining, stationing, or placing more than four pickets or other persons at any one time at or about any entrance to plaintiff's refinery at Oleum, Contra Costa County, California.

"5. Picketing, or maintaining or stationing any pickets on the property of plaintiff at Oleum, California, and from marching or loitering on said property.

"6. Interfering with the movement of any automobile, trucks, railroad engines or trains, or other vehicles and from

standing, lying, or gathering in the pathway of any automobiles, trucks, railroad trains or other vehicles which enter or leave or attempt to enter or leave or are about to enter or leave plaintiff's refinery at Oleum, Contra Costa County, California.

"7. Stationing or placing any picket or pickets with the intention or for the purpose of accomplishing any of the actions enjoined in paragraphs 1, 2, 3, 4, 5, and 6 above."

Immediately following the order to show cause, and as a part of it, the superior court further "Ordered that pending the hearing and determination of the foregoing Order to Show Cause the defendants and each of them, their agents, servants, representatives, officers, employees, members and pickets and each of them be and they are hereby restrained and enjoined from committing or performing directly or indirectly or by any means whatsoever any of the foregoing acts."

Pursuant to stipulations, the court made and entered orders, from time to time, continuing the hearing on the order to show cause and continuing in full force and effect the temporary restraining order.

The court issued orders to show cause (filed October 1 and 14, 1948) based upon affidavits filed by J. A. Grant, L. J. Briggs, Robert C. Diehl, J. H. Davison, Donald Ritchey, and two by G. H. Hermmen. Answering affidavits were filed by persons charged in the affidavits and served with the orders to show cause. Trial upon the issues thus presented commenced November 26 and concluded December 31, 1948.

Upon the conclusion of the taking of evidence, counsel for the alleged contemnors moved for a continuance of the hearing, under section 595 of the Code of Civil Procedure, and filed his affidavit in support of the motion. Thereupon the court directed counsel for the alleged contemnors to proceed with his oral argument, to which counsel objected that there was not sufficient time to prepare for or present oral argument. The motion was thereupon denied by the court and the matter taken under submission.

On January 12, 1949, the court entered its order finding that the petitioners had violated the temporary restraining order, and adjudging them in contempt of court because of such violations.

Petitioners challenge the validity of the judgments of contempt upon six separate grounds, each of which, they urge,

requires annulment of those judgments by this court in this proceeding.

Those several grounds, in the order in which presented by petitioners, save for transposition of their sixth point to first position, are: (1) The evidence is insufficient to support certain of the judgments as to certain of the petitioners, (2) the restraining order is void for violation of petitioners' right of freedom of speech and for uncertainty of the complaint and affidavits upon which based, (3) the unions, as unincorporated associations, are not entities and therefore cannot be guilty of or liable for contempt, (4) the trial court had no jurisdiction to enjoin the acts in question because they were committed in a labor dispute over which the federal government and its courts have exclusive jurisdiction, and some of them were committed upon navigable waters over which the federal government and its courts have exclusive jurisdiction, (5) in denying petitioners' motion to quash certain subpoenas duces tecum (assertedly issued upon affidavits which failed, contrary to state statutory requirements, to show the materiality of the documents sought), the trial court denied petitioners protection against unlawful search and seizure, and (6) in denying their motion, at the conclusion of the taking of evidence, for a continuance to enable their counsel to prepare for and to present oral argument, the trial court denied them their right to due process and the right to representation by counsel. They present the additional point that Union Oil Company of California was improperly joined as a respondent in their petition for the writ, that the company is neither a real party in interest nor a party whose interest would be directly affected by this proceeding, and that this proceeding should be dismissed as to the company.

We will consider, first, their point that as to some of the charges and some of the petitioners there is a lack of evidence to support the judgments. We will then consider their other points in the order in which they have presented them. The asserted lack of evidence, we will discuss in connection with the several judgments and the charges upon which each is based.

1. *The Sufficiency of the Evidence to Support the Judgments as to the Several Petitioners.*

In appraising the sufficiency of the evidence in a proceeding such as this, the inquiry is whether or not a judgment holding a petitioner guilty of contempt of court is supported

by substantial evidence; not whether it is supported by a preponderance of the evidence, it being the function of the trial court, not the reviewing court, to weigh the evidence.

In enunciating this test, for use in this type of proceeding, our Supreme Court in *Bridges* v. *Superior Court*, 14 Cal. 2d 464 [94 P.2d 983], directed attention, first, to the principle that "On petition to review the judgment of the trial court, it is definitely settled that the sole question before the reviewing court is one of jurisdiction of the trial court to render the judgment under review. If it be determined that in the rendition of said judgment the trial court acted within its jurisdiction, then the inquiry ends, and the only order the reviewing court is authorized to make is one affirming the proceedings of the trial court. On the other hand, should it appear from the record as certified to us that the court either had no jurisdiction to pronounce said judgment, or exceeded its jurisdiction in doing so, then the proceedings should be annulled. (Sec. 1075, Code Civ. Proc.) .Other than as just indicated, the writ of *certiorari* will not be granted to review errors of law (*People* v. *Latimer*, 160 Cal. 716 [117 P. 1051]), or mere questions of fact. (*White* v. *Superior Court,* 110 Cal. 60 [42 P. 480].)" (Pp. 484-485.)

The existence of evidence before the trial court enters into the question of the jurisdiction of the trial court to act. As stated in the Bridges case, "in passing upon the question of the trial court's jurisdiction, the reviewing court may consider the evidence before the trial court for the purpose of determining whether it was sufficient to give that court jurisdiction to render its judgment finding the accused guilty of contempt, and in case the court finds that the evidence is insufficient to sustain the conviction it will annul the judgment. (*McClatchy* v. *Superior Court,* 119 Cal. 413 [51 P. 696, 39 L.R.A. 691], *Hotaling* v. *Superior Court,* 191 Cal. 501, 506 [217 P. 73, 29 A.L.R. 127], and *Titcomb* v. *Superior Court,* 220 Cal. 34, 44 [29 P.2d 206].) But in such a case, the review of the evidence is limited to determining whether there was any substantial evidence before the trial court to sustain its jurisdiction. The power to weigh the evidence rests with the trial court. (*Daily* v. *Superior Court,* 4 Cal.App.2d 127, 134 [40 P.2d 936]; *McFarland* v. *Superior Court,* 194 Cal. 407 [228 P. 1033]; *In re Brambini,* 192 Cal. 19 [218 P. 569]; *Strain* v. *Superior Court,* 168 Cal. 216, 223 [142 P. 62, Ann.Cas. 1915D 702]; *White* v. *Superior Court,* 110 Cal. 60,

64 [42 P. 480]; *Imperial Water Co.* v. *Board of Supervisors*, 162 Cal. 14 [120 P. 780].)'' (14 Cal.2d at p. 485.)

The court considered and distinguished *In re Buckley*, 69 Cal. 1 [10 P. 69], *Hotaling* v. *Superior Court*, 191 Cal. 501 [217 P. 73, 29 A.L.R. 127], and other cases not cited, upon the ground that each of those was an original proceeding before the Supreme Court,* saying: ''In proceedings of that nature, the same rule that governs the trial court in contempt proceedings is applicable to this or any appellate court at the hearing of contempt proceedings originally brought in such courts. It has repeatedly been held that an accused on trial for contempt must be proved guilty beyond a reasonable doubt. But such rule, as will be seen from the authorities cited above, has no application in a proceeding such as the one before us, to review the judgment of the trial court in finding the accused guilty of contempt.'' (14 Cal.2d at p. 485.)

''In considering the evidence before the trial court in the light of the rule just stated, it is our sole duty to determine whether such evidence is of sufficient substantiality to support the judgment of conviction, or as stated in *Daily* v. *Superior Court, supra* (p. 124): 'In the proceeding before us, the extent of our power is to inquire whether there was any evidence before the trial court sustaining its jurisdiction.' '' (14 Cal.2d at p. 486.)

These principles, applicable in such a proceeding as this, are the law today in California. They have been applied in a number of subsequent decisions of our Supreme and appellate courts, and cited with approval in others.

That the sole question in such a proceeding is one of jurisdiction of the trial court to render the judgment under review, we find stated in *Hume* v. *Superior Court*, 17 Cal.2d 506, 512 [110 P.2d 669]; *Taylor* v. *Superior Court*, 20 Cal.2d 244 [125 P.2d 1]; *Rappaport* v. *Superior Court*, 39 Cal.App.2d 15, 20 [102 P.2d 526]; *Associated Lbr. etc. Co.* v. *Superior Court*, 79 Cal.App.2d 577, 582 [180 P.2d 389]; and *In re Oxman* (habeas corpus), 100 Cal.App.2d 148, 151 [223 P.2d 66]. The reviewing court may examine the evidence to determine the jurisdictional question and annul the judgment of contempt if the evidence does not justify that judgment or, conversely,

---

*The Buckley case was an original proceeding in the Supreme Court. The Hotaling case was a proceeding upon a writ to review a contempt order of the superior court, an order issued in the case after the filing of the remittitur, following the Supreme Court's decision in *Hotaling* v. *Hotaling*, 187 Cal. 695 [203 P. 745].

annul an order which erroneously sustained a demurrer to an affidavit which sufficiently alleged the commission of a contempt (*Taylor* v. *Superior Court, supra,* 20 Cal.2d 244, 246). As to sufficiency of the evidence, if the trial court had jurisdiction the reviewing court's attention is confined to a consideration of whether or not there was any substantial evidence to support the judgment of contempt (*Rappaport* v. *Superior Court, supra,* 39 Cal.App.2d 15, 22). ██ In this state, the writ of certiorari will issue only when an inferior tribunal has acted without or in excess of its jurisdiction; this writ cannot be used as a writ of error whether an appeal be available or not (*Howard* v. *Superior Court* (reviewing a probate order, not a judgment of contempt), 25 Cal.2d 784, 787, 788 [154 P.2d 849]). ██ In a proceeding upon a writ of habeas corpus to review a judgment of contempt (a writ which tests the jurisdiction of a lower court to act), the burden is upon the petitioner to file the necessary records and papers with the reviewing court; the burden is on him to establish the necessary grounds for his release, and the presumption of regularity of the proceedings in support of the judgment prevails in the absence of evidence to the contrary (*In re Oxman,* 100 Cal.App.2d 148, 150-151 [223 P.2d 66]). In a habeas corpus proceeding to review a petitioner's conviction of violation of an antipicketing ordinance (an ordinance found valid in part and invalid in part), petitioners failed to show that they were not convicted for violating the valid part of the ordinance; such a proceeding being in the nature of a collateral attack, the judgment under review carried with it a presumption of regularity; this is not a conclusive presumption, but it put a burden on the petitioners of proving that their convictions were based upon the invalid part of the ordinance, and they failed to meet that burden (*In re Bell,* 19 Cal.2d 488, 500 [122 P.2d 22]).

We note that there are a few decisions which contain statements from which it might be inferred that the evidence test used in the Buckley case is applicable upon review of a judgment of contempt, statements apparently stemming from the Hotaling case. These decisions are: *Mattos* v. *Superior Court,* 30 Cal.App.2d 641 [86 P.2d 1056]; *Wilde* v. *Superior Court,* 53 Cal.App.2d 168, 177 [127 P.2d 560]; *In re Clarke,* 60 Cal. App.2d 21, 26 [140 P.2d 92]; *Groves* v. *Superior Court,* 62 Cal.App.2d 559, 568 [145 P.2d 355]; *In re Felthoven,* 75 Cal. App.2d 465 [171 P.2d 47]; and *In re Donovan,* 94 Cal.App. 2d 399, 402 [210 P.2d 860]. The making of this comment

carries with it no suggestion that any of the decisions last cited may have applied the wrong test in reviewing the evidence. In nearly all, if not all, the decision was based primarily upon the fact that the affidavit alleging contempt failed to state facts sufficient to constitute a contempt. In the Wilde case, the reviewing court found a total absence of evidence in support of one of the material facts. (53 Cal. App.2d, at p. 180.) In the Clarke case, the reviewing court's examination of the record disclosed an absence of any "substantial evidence" tending to prove one of the material facts. (60 Cal.App.2d, at p. 32.)

We will view the several judgments of contempt serially, with the charges upon which each is based, and in connection with each the questioned sufficiency of the evidence. We identify each judgment by the name of the person whose affidavit initiated the proceeding, referring to the affidavit as a "complaint."

Each complaint states that the temporary restraining order was issued by the court September 13, 1948; sets forth the provisions of the order *in haec verba* and states that at all times mentioned the order has been and is in full force and effect; and alleges that at all times mentioned each of the alleged contemnors had notice and knowledge of the order and its provisions; that each of the alleged individual contemnors is and at all times mentioned has been a member and agent of each union and at all times acted as such; and that each alleged contemnor violated the order willfully, intentionally and unlawfully. The allegations of each complaint were put in issue by the answering affidavits, except that membership of the individuals in each union was admitted and petitioners Casey and the Local Union in their answer to count II of one of the Hemmen complaints (not the one under review herein) expressly admitted that "Frank M. Casey is . . . an agent of Local 326." Casey verified the answering affidavits on behalf of the Local Union as well as in his individual capacity.

*The Grant complaint,* an affidavit by J. A. Grant, filed September 27, 1948, alleged, in count III thereof, that petitioners Phillips and the Local Union (and other persons named) violated the temporary restraining order on September 17, 1948, by threatening the train crew of a Southern Pacific railroad train with bodily harm and threatening to strike the crew with rocks and to use other violence on them if they drove the train into the refinery; that the train crew was about to operate the train through an entrance to the

refinery to do business with plaintiff and haul tank cars from the refinery; and that by reason of said threats and acts the train crew was prevented from operating the train and refused to operate it into the refinery or to transact business with plaintiff.

The court found these allegations true as to Phillips, the Local Union, its officers and the members of the strike committee of the Local, and adjudged Phillips and the Local Union guilty of contempt of the authority of the court. As punishment therefor, the court directed the union to pay a fine of $50, and Phillips a fine of $25; Phillips, if he defaulted in payment of his fine, to be imprisoned in the county jail at the rate of one day's imprisonment for each $2.00 of the fine.*

The evidence shows that on the afternoon of September 17, 1948, a Southern Pacific train crew brought an engine and caboose from Rodeo to Oleum for the purpose of entering the premises of respondent's refinery and taking out some tank cars. The railroad tracks in this vicinity run close to the shore of San Pablo Bay. As this train approached a certain switch and was stopped for the purpose of unlocking and opening the switch, a boat with men in it was lying from 10 to 25 feet offshore. The boat had a sign on it "Picket" or "Picket Boat." When the train stopped and the trainmen got out and approached the switch to unlock and open it, rocks were thrown from men in the boat. Edmister (one of the men in the boat) testified that when the train came up and stopped to switch, he told them there was a picket there and "we" didn't want them to go in, and that he threw some rocks, and they (the trainmen) got in the switch engine and rode back to Rodeo. Phillips (in the boat with Edmister) denied that he threw any rocks and said that nobody else (nobody except Edmister) threw any rocks that he saw. However, three persons who were standing near the switch and knew and recognized Phillips, testified that he did throw rocks, and that some dozen to 20 rocks were thrown. This is substantial evidence of rock throwing by Phillips.

Petitioners' other contention in respect to Phillips is that there was no evidence that he had knowledge or notice con-

---

*The court dismissed counts one and two of the Grant complaint because the persons charged thereunder did not have notice or knowledge of the restraining order or its terms, and for like reason dismissed count three as to persons other than Phillips and the Local Union. Count four was dismissed during the trial.

cerning the temporary restraining order or any of its provisions. It is true that he denied having any such knowledge or notice. However, there is testimony that on that occasion a deputy sheriff told the men in the boat they were not supposed to throw rocks, and that they had to be 200 yards from the Union Oil Company property. Phillips denied hearing any such statement. He admitted the boat was close inshore but said he did not even hear the conversation that Edmister had with anyone on shore; did not hear anything anybody said on shore; he was yelling at the time Edmister was throwing rocks and did not recall that Edmister was yelling at that time. He was at first quite uncertain whether there was anyone else in the boat beside himself and Edmister, said there may have been another fellow, or maybe two more, could not swear to it, and finally his best recollection was that there were others in that boat beside himself and Edmister. He was positive, however, he had not done any picket duty prior to this date (Sept. 17). But earlier in the trial he testified (in relation to counts I and II of the Grant complaint) that on two previous occasions, September 15 and September 16, he had been out in a boat on San Pablo Bay. On the 15th he was in a cabin cruiser, which carried a sign, ''Oil Workers' Picket Boat,'' a sign he put on the boat on September 5. The picket sign was given him by the union and he put it on the boat; did not keep it on continuously, put it on and off upon occasion. The gas for that boat was given him for working. In his earlier testimony he said that between September 5 and 15 he picketed barges that came up the channel, and tankers, also over at Vallejo, whenever a boat was coming in; went out in the bay on the 15th and noticed a train coming, then went to Oleum and put the picket sign on the boat and waited for the train to come; saw a locomotive there, with fellows on the tracks, and a small boat offshore; stayed there half an hour, maybe a little longer; did not hear any conversation of the persons in the small boat.

On September 16, according to Phillips' earlier testimony, he was out in the bay in a smaller boat, with five other persons, fished for some time without any luck; they noticed a train from Rodeo approaching Oleum, so went to Oleum and put the picket sign on the boat and waited for the train to come; these signs were in the boat before they started fishing; the boat was lying offshore opposite the switch some 15 to 30 minutes before the train arrived; had been out for two or two and a half hours when they approached Oleum for the

purpose of picketing that train; said that when the train arrived Mr. Costa, in the front of the boat, and about 6 or 7 feet from Phillips, got up and said something to the trainmen about "Are you going to open that switch?" but that Phillips did not hear what else Costa said, nor any reply. He saw Mr. Eshleman that day (the 16th) and knew that Mr. Eshleman said something, but could not hear Eshleman, could not hear the words, although Phillips admitted his hearing was all right.

There was testimony by the witness Creed that when the trainman unlocked the switch (Sept. 16) and the boat was within about 10 feet of the shore, Costa said, "Don't throw that switch," and "You are not going to take anything out of the refinery"; that the trainman asked, "Is that a threat?" and Costa said "Yes." Creed further testified that following the event just described, on the 16th, Mr. Eshleman, standing near the switch, close to the water's edge, stepped up and asked these men in the boat if they knew there was an injunction and court order forbidding any interference with trains out or in, to which Costa replied, "That doesn't make any difference. You're not going to take any cars out"; the bow of the boat was about 10 feet from shore; Creed was some 30 feet north of the switch, was about 35 to 40 feet from Costa, heard what Costa and the trainman said, and heard what Eshleman said. This testimony by Creed was corroborated by the witnesses Grant and Diehl. Diehl said that Eshleman shouted, and the witness Eber testified that Eshleman cupped his hands and hollered.

This evidence supports the implied finding of the trial court that Phillips heard the conversation between Costa and the trainman and the information concerning the restraining order furnished by Eshleman. It is a reasonable inference that such information, given under those circumstances to an active member-picket such as Phillips, produced in his mind the requisite knowledge of the pertinent provisions of the restraining order. This knowledge he acquired during and at the conclusion of his boat-picketing activities on the 16th but prior to those of the 17th of September.* ▆ The knowl-

---

*The evidence concerning the events that occurred on the 15th and 16th of September was available for consideration by the court in relation to the picketing which occurred on the 17th of that month because later during the trial the parties stipulated that, as to all of the witnesses who testified more than once in the case, all of their testimony and the other matters could be applied to each count (each charge or complaint of a violation of the temporary restraining order).

edge a person may have when material to an issue in a judicial proceeding is a fact to be proven as any other fact. It differs from physical objects and phenomena in that it is a state of mind like belief or consciousness and cannot be seen, heard or otherwise directly observed by other persons. It may be evidenced by the affirmative statement or admission of the possessor of it. If he is silent or says he did not have such knowledge, it may be evidenced in other ways, e. g., by his conduct or by proof that the information was given him in writing and he read the document, or orally and he heard the statement made. ''The state of mind of a person, like the state or condition of the body, is a fact to be proved like any other fact when it is relevant to an issue in the case, and the person himself may testify directly thereto. (See 29 [20] Am.Jur. 312.) Whenever the motive or intent with which an act was done is relevant, direct testimony is admissible, although not conclusive. (*Harned* v. *Watson,* 17 Cal.2d 396, 403 [110 P.2d 431] ; *Gilmour* v. *North Pasadena Land etc. Co.,* 178 Cal. 6, 9 [171 P. 1066] ; *Horton* v. *Winbigler,* 175 Cal. 149, 156 [165 P. 423] ; *Karr* v. *Powell,* 66 Cal.App.2d 28, 33 [151 P.2d 576] ; see Code Civ. Proc., § 1870; 1 Jones Commentaries on Evidence, §§ 170 et seq.; 10 Cal.Jur., Evidence, § 117; 20 Am.Jur., Evidence, § 338; 31 C.J.S., Evidence, § 178.) Also, when knowledge of a fact has important bearing upon the issues, evidence is admissible which relates to the question of the existence or nonexistence of such knowledge and a wide range of proof is allowed. (*Katz* v. *Bedford,* 77 Cal. 319, 323 [19 P. 523, 1 L.R.A. 826] ; *Central H. Imp. Co.* v. *Memorial Parks, Inc.,* 40 Cal.App.2d 591, 609 [105 P.2d 596] ; see Code Civ. Proc., § 1870; 10 Cal.Jur., Evidence, § 118; 20 Am.Jur., Evidence, § 336; 31 C.J.S., Evidence, § 178.)'' (*Cope* v. *Davison,* 30 Cal.2d 193, 200 [180 P.2d 873, 171 A.L.R. 667].) The authorities therein cited indicate the wide range of proof allowed. In *Katz* v. *Bedford,* 77 Cal. 319 [19 P. 523, 1 L.R.A. 826], evidence that a party was present and saw certain work done was deemed material as tending to show that payment for that work without objection was made by him ''with knowledge of the manner in which the work was done and its quality.'' (P. 323.) In *Treadwell* v. *Whittier,* 80 Cal. 574 [22 P. 266, 13 Am.St.Rep. 175, 5 L.R.A. 498] (cited in 20 Am.Jur., Evidence, § 336), evidence that the defendants were cautioned by a skilled mechanic who had repaired their elevator that they were running it carelessly, was held ''competent and material to show a knowledge by defendants that they were

operating the elevator incautiously and carelessly.'' (P. 602.)
Whenever "the intention, feeling, belief, or other mental state of a person at a particular time . . . is material to an issue under trial, evidence of such person's declarations at the time indicative of his then mental state are admissible in evidence.'' (*Estate of Carson,* 184 Cal. 437, 445 [194 P. 5, 17 A.L.R. 239], cited in 20 Am.Jur. 312.) In a prosecution for receiving stolen property, contradictory statements by the defendant and evasive answers to questions concerning ownership and the manner in which he acquired the property are evidentiary of guilty knowledge at the time of acquisition. (*People* v. *Smith,* 26 Cal.2d 854 [161 P.2d 941].) These general principles of proof of knowledge are of course applicable in a contempt proceeding as in any other type of proceeding. (See *In re Brambini,* 192 Cal. 19, 36-37 [218 P, 569], and *Sorrell* v. *Superior Court,* 73 Cal.App.2d 194 [166 P.2d 80].)

As to the element of intent, we must bear in mind that "Disobedience of any lawful judgment, order, or process of the court" is by statute defined as contempt of the authority of the court. (Code Civ. Proc., § 1209.) When it appears by substantial evidence that a person committed an act proscribed by a lawful order of a court and did so with knowledge of that order and its pertinent provisions, there is substantial evidence that will support a finding of an intentional violation of the order. (See *Hume* v. *Superior Court,* 17 Cal.2d 506, 512-13 [110 P.2d 669], and *In re Jarvis,* 57 Cal. App. 533, 538 [207 P. 494].) Petitioners cite *In re Donovan,* 94 Cal.App.2d 399 [210 P.2d 860], as holding that something more by way of proof of intent is required in a contempt proceeding. We do not so read that decision. The injunction there involved was mandatory in character, hence not in force pending an appeal, and the order made in the contempt proceeding contained no finding which negatived a belief that the injunction was unenforceable pending the appeal. Here the restraining order was in full force and effect and the finding that as to Phillips all of the allegations of the complaint were true included findings that he committed these acts with knowledge that they were forbidden by order of court and that he did so willfully and intentionally.

We conclude that the judgment of contempt entered against Phillips on the Grant complaint was supported by substantial evidence and that the trial court had jurisdiction to render that judgment.

■ *The Briggs complaint,* an affidavit by L. J. Briggs, filed October 1, 1948, alleged that the International and the Local Unions, Harold A. Madden, Frank M. Silva, and Harry E. Lakeman, on September 22, 1948, at Oleum, violated the restraining order in that they threatened the train crew of a railroad train of the Southern Pacific Company with bodily harm and attempted to strike the crew with rocks and threw rocks at the crew while the crew was switching freight cars preparatory to driving the train through an entrance to plaintiff's Oleum refinery, thereafter to haul tank cars from the refinery; by reason of which acts the train crew was prevented from operating, and refused to operate the train into the refinery or to transact any business with the plaintiff.

The court found all of the allegations true, except that Madden at the time alleged had neither notice nor knowledge of the restraining order or of its provisions; dismissed as to Madden; and adjudged each union, Silva and Lakeman guilty of contempt of the authority of the court. As punishment therefor, the court ordered the International Union to pay a fine of $50; the Local Union a fine of $75; and Silva and Lakeman a fine of $25 each.

This was a case of picketing a switch engine and caboose by boat. It occurred on the afternoon of September 22, 1948. Silva and Madden had gone out on the bay, from near Rodeo. Silva testified he knew the train was going to make that move (Rodeo to Oleum to haul tank cars into the plant), knew the train's schedule, and got there before the train did. He took three or four rocks in the boat, all they needed. When the train arrived, his boat was out about 70 feet from the main line, 10 or 15 feet from the shore. He had turned his outboard motor off and was rowing. Madden stood up on the rear seat, facing the shore. Silva figured when the engine came that far it was time to throw a couple of rocks, and told Madden to hit the caboose, not the trainmen. When the train stopped, Silva told Madden to let them have it. One rock hit the caboose and one the engine. Then the whistle blew, and that, said Silva, meant there was a threat on, a threat from those two rocks; Silva thought maybe they (he and Madden) could do it that way, and "we did it," "we stopped the train"; there was an argument then between the men on shore, and finally the train pulled out. This is substantial evidence, by Silva himself, in addition to the testimony of four persons who witnessed these events from the shore, each of whom recognized

Silva as the man who handled the oars and Madden as the man who threw the rocks.

Silva denied having any knowledge of the injunction or its provisions on the 22d; said he had no such knowledge until a deputy sheriff told him about it October 6 or 7, after he had been served five times with papers concerning it. Yet, earlier in the trial, testifying concerning events in which he participated on September 15 and asked when he did find out about the injunction, he testified, "I don't remember, but later on I did find out. I think Mr. Carlson [deputy sheriff] or somebody told me, and that was, say, about, I should say, maybe a week or so after this [on the 15th] happened, maybe; I am not sure now." Confronted with this testimony, he said, "You must remember I said I wasn't sure what time it was—might be a week, might be two weeks, might be three weeks."

He had been active in picketing; testified he had picketed the main gate to the refinery during the first week of the strike, and the pedestrian gate after the 15th of September, on which occasions he might have seen those notices (placards 11 inches by 14 inches, setting forth the text of the injunction, posted at or near the gates on September 14), but did not pay any attention to them. Shown pictures of himself, with a picket sign, standing near the pedestrian gate (on Sept. 27), he said he would always stop there and talk a little bit, if he saw an opening, and always found a place where there was an opening; that every time he came up to the picket line he placed himself where there was an opening, so he always had a picket sign in his hand.

He said he had difficulty reading English, but that he read English a little bit in connection with his work, the switching lists used by him during the eight years he had worked as a brakeman for the company's plant locomotive, prior to which he had worked about 19 years on the company's railroad equipment and trucks within the refinery. Asked if he could read more than the word "Notice" on the placard (posted at the refinery entrances), which was produced in court, he said, "Yes, if I was getting close to it." Asked to read further, he read, " 'This refinery is protected by the restraining order and you are——' How do you pronounce that word?" By the court, "Injunction." Silva continued reading, " 'October 13, 1948, in the case of the Union Oil Company'—at this time, my eyes are getting blurred, Your Honor." That was a demonstration of a working knowledge of English, written as well as spoken.

He testified, also, that he used to see Frank Casey four or five times a day. (Casey was financial secretary and business agent of the Local Union, and a member of its strike committee, and was served with a copy of the restraining order on the 14th of September.) Further indication of Silva's activity in picketing is furnished by certain issues of "Off Stream," a mimeographed news bulletin prepared by the publicity committee, and bearing the legend "Issued by The Strike Committee," of the Local Union, during a portion at least of the strike period. The issue dated 9-19-48, under the heading "Picket Boats," told the members of the union that "Frank Silva has one of the toughest jobs in this strike. He's in charge of the 'tank Car Pickets.' He's responsible for keeping the tank cars IN the refinery—and they're still there! First the boys picketed the gates onto the tracks; then they were moved back 200 yards, so they picketed on the tracks; SP cops ran them off the tracks, so now 6 boatloads take turns picketing the switch, from the Bay. Our water-borne operation is a success so far; and Frank said 'We intent to hold that line.' We believe they will. Keep up the good work, Frank and CREW!" The issue of Off Stream dated 9-22-48 carried a drawing of four men in a boat close offshore from a railroad track, two standing up and throwing rocks at fish, a sign by the track reading, "Oleum Gate 200 yards, S.P.R.R. Co.," and a heading, "We Picket by Land and by Sea." In the text of that issue appears the news item: "Our sea-going 'switch-pickets'—not to be confused with the Nelson and Swan picket fleet—were on the job. But the company moved two tank cars around and up the hill and past the Carpenter Shop. The pickets up above didn't realize what was happening, and didn't get word down to the switch-boat. So the first thing the boys in the boat knew, two tank cars were out on the main track, having come out the gate by the Edeleanu Plant." Marcos, the president of the Local Union testified that he did not know whether Silva was a captain in charge of the boats: that he heard Silva referred to as "Admiral of the Fishing Fleet," but did not think Silva had the responsibilities of keeping the tank cars in, any more than any other member of the Local.

Silva's admission that he found out about the injunction a week or so after the 15th of September was made in the presence of the trial judge, who by that very fact could appraise and evaluate the admission as a reviewing court cannot do from a mere reading of the typewritten record. The wit-

ness' manner of speaking and his evasiveness on the question of knowledge constituted evidence by conduct given the trial judge by the witness as to his state of mind concerning that knowledge and when it was acquired by him. Additional circumstances were the fact that notices of the restraining order were posted at all entrances to the refinery commencing September 14, that after September 15, according to Silva's testimony, he picketed at the pedestrian gate whenever he found an opening and that he always found an opening, and that he may have seen those notices but did not pay any attention to them. Such an admission given by a witness under those circumstances was substantial evidence upon which the trial court might base its finding that on September 22 Silva had knowledge of the pertinent provisions of the restraining order. Proof of opportunity to know of the injunction through the signs at the gates, alone, is not sufficient. However, it is stretching human credulity to the utmost to believe that Silva, and the other pickets, standing around and near the posted notices, would not indulge their natural curiosity and look at the signs, unless it were a situation such as referred to in *People* v. *Brown*, 74 Cal. 306 [16 P. 1], where the court said concerning the proof of knowledge on the part of a receiver of stolen property, "If a case could arise . . . in which it should appear that he suspected the fact and abstained from inquiry lest he should know, knowledge might be inferred." (P. 310.) While perhaps any one of the circumstances above mentioned, standing alone, might not justify an inference of knowledge of the injunction, all of them taken together, considered in the light of the situation at the plant's entrances, make such an inference a very reasonable one.

 Lakeman, by his own testimony and that of others, was alone in a boat, offshore, during these occurrences on the 22d. Several witnesses testified that during these occurrences Lakeman was cruising in and out near shore, and that he yelled to persons on shore, calling them "scabs" and "rats." Several witnesses saw signs on several of the boats. There were five boats offshore of the switch that day; two close in, the others further out. One witness identified the signs as "Picket" but none identified those boats as including Lakeman's, and one saw no sign on Lakeman's. Lakeman testified he had no picket sign on his boat, and did not recall seeing any on the other boats. He said he went out in his boat to find if others had caught any fish; he had been out about 45 minutes to an hour, when, nearing Oleum, he came over toward

these other boats to see what was going on, and recognized two men he knew inside the refinery fence, hollered at one of them asking what he was doing in there and called the other a "rat"; there was a train on the track; he stayed around three-quarters to an hour; recognized Silva in one of the boats; didn't know who the others in the boats were; his only purpose in staying there that length of time was that he heard some of the boys were going back to work and wondered who they were. He denied that on that day (the 22d) he had any notice or knowledge of the restraining order; but earlier in the trial testified that on the 16th he was in the boat with Costa and Phillips, near the switch, that Costa hollered at one of the trainmen not to touch the switch, and the fellow said, "What are you going to do?", and did not recall any more conversation; and in this portion of his testimony said he heard Eshleman was supposed to have said something to Costa but he, Lakeman, did not hear Eshleman's voice. He said he had done picket duty before; a couple of times early in the strike at the dormitory gate of the plant, and once in a boat about a week before the 22d; said his duties for the union were to get fish and take them over to the hall, and get gasoline for the outboard motors at the Port of Oakland for the fishing boats that went out; that he handled gasoline for the boats at Joseph's, near Rodeo, gasoline purchased to donate to the union, used for the boats to do the fishing, he did not know if it was used in the boat motors in picketing or not. Here, as in the case of Phillips under the Grant complaint, was substantial evidence supporting the trial court's finding that Lakeman, as charged in the Briggs complaint, had knowledge and notice of the restraining order and its provisions, and that he was no mere bystander upon the occasion of the violent picketing of the train by Silva and Madden.

We conclude that the judgment of contempt entered against Silva and Lakeman on the Briggs complaint was supported by substantial evidence, and that the trial court had jurisdiction to render that judgment.

*The Diehl complaint*, an affidavit by Robert C. Diehl, filed October 14, 1948, alleged that the International Union and the Local Union and Frank M. Silva, Stanley Shulman and Frank Coppa, on September 27, 1948, at Oleum, violated the temporary restraining order by throwing rocks at and damaging a switch engine of plaintiff at the refinery and did intimidate, molest, harass and threaten bodily harm to, and throw rocks at Robert C. Diehl, John Norton, John Salmond

and J. A. Grant, employees of plaintiff who were then on the refinery property of plaintiff.

The court found all of the allegations true except that Shulman did not at that time have notice or knowledge of the restraining order or of its provisions; dismissed as to Shulman and adjudged each union and Silva guilty of contempt of the authority of the court. As punishment therefor the court ordered the International Union to pay a fine of $75; the Local Union a fine of $100; and Silva a fine of $50.

Substantial evidence was adduced that would probably support the judgment if the complaint stated facts sufficient to show on its face the commission of acts enjoined by the restraining order. The question is whether or not the alleged threatening of bodily harm to and throwing of rocks at certain of plaintiff's employees "who were then on the refinery property of plaintiff" were acts forbidden by the restraining order. If they were not, the complaint failed to allege the commission of acts which constituted disobedience of that order.

If those acts were forbidden by that order, they were forbidden by the provisions of its first paragraph. But that paragraph is a single sentence which concludes with the words "while entering, attempting to enter, leaving or attempting to leave plaintiff's refinery at Oleum . . ." Do those words limit everything that precedes them in that sentence or merely the immediately preceding words, "driver or operator of any vehicle, engine or train"? It seems clear that they limit and modify everything that is said in that sentence. That is their natural significance when one reads the sentence as a whole. Any other reading would result in no limitation as to the place of molestation of "plaintiff's officers, agents, employees, customers, or any other persons having business with plaintiff, or attempting to serve plaintiff." "[H]aving business with plaintiff" is not a limitation as to place. A person might have business with plaintiff at any place in the state. Then there would be the question whether "having business with plaintiff" applies to "plaintiff's officers, agents" or "employees." If not, this provision of the order would apply to the officers and employees when at the plant or at home, at work or on vacation, at any time and any place in the state. No intent to make an order of such a wide sweep can reasonably be ascribed to the trial court, especially when the gravamen of the complaint in the action and of the affidavits filed in support of the application for the restrain-

ing order was the obstruction of entrances to the plant and interference with traffic in and out of the plant.

In the case of an alleged contempt occurring outside the presence of the court, the affidavit charging contempt must state facts which constitute contempt. If it fails to do so, the court does not acquire jurisdiction to render a judgment thereon, no matter how clearly the evidence at the trial may demonstrate a violation of the judicial process. (*Hutton* v. *Superior Court,* 147 Cal. 156, 159 [81 P. 409]; *Wilde* v. *Superior Court,* 53 Cal.App.2d 168, 177 [127 P.2d 560].)

We conclude, therefore, that because of the failure of the Diehl complaint to allege the commission of acts enjoined by the restraining order, the judgment entered thereon was without jurisdiction and should be annulled.

*The Davison complaint,* an affidavit by J. H. Davison filed October 14, 1948, alleged that the International Union and the Local Union, Frank M. Casey, and Charles C. Coughlan, on September 27, 1948, at Oleum, and Rodeo, violated the restraining order in that they threatened bodily harm to and intimidated, obstructed, molested and harassed Williard Frietas (a contractor of R. T. Collier Corporation), J. H. Davison, O. H. Ahnberg, and L. G. Hall (employees of R. T. Collier Corporation); that said contractor and employees of the Collier Corporation were attempting to accept delivery from plaintiff at the refinery and to transport to a railroad car, at Rodeo, a quantity of coke; that by reason of said acts of the persons named, the employees of the Collier Corporation were prevented from transporting the coke and from transacting business with plaintiff.

The court found all of the allegations true except that Charles Coughlan did not violate any provisions of the restraining order; dismissed as to Coughlan; and adjudged each union and Casey guilty of contempt of the authority of the court. As punishment therefor, the court ordered the International Union to pay a fine of $100; the Local Union a fine of $125; and Casey a fine of $50.

The evidence under this complaint demonstrates interference with and prevention of an attempt, on the 27th of September, 1948, of employees, and a contractor, of the R. T. Collier Corporation to remove a carload of petroleum coke from the Oleum plant. Davison, of the Collier company, testified that he arrived at a ramp along the railroad track near Rodeo at about 8 in the morning, for the purpose of cleaning a gondola car and readying it for loading at that point. This

he did and in about an hour went to the coke pit at the respondent's refinery and there waited for two trucks to arrive from San Jose. At about 10:30 a. m. the trucks arrived and Davison (with Hall, superintendent of the Collier company) returned to the ramp at Rodeo, where they found the gondola had been moved along the track about 75 feet from the ramp and certain car jacks used to move the car were in the water of the slough near by. They commenced preparing to move the car back in place opposite the ramp by use of a winch and a cable. Hall had entered a shack or shed under or near the ramp to operate the electrical equipment and Davison was outside handling the cable, when they were approached by some men whom Davison recognized as strikers. They asked Davison what he was doing. He replied, "Loading coke." He recognized several of them but did not know their names, other than Frank Casey. One of them yanked the cable out of his hands; then the group proceeded to corner Hall in the shack; they surrounded him. Casey said, "We are getting hungrier every day, and the hungrier we get the meaner we get, and we are getting God-damn mean this morning, so that if you fellows attempt to load any coke here, we will beat the hell out of you, your drivers or anybody that's got a God-damn thing to do with this coke haul." Davison and Hall tried to explain to them that they had nothing to do with the strike and no grievance with the union, that the coke belonged to them and they were getting what was rightfully theirs. But they were told that did not make any difference. Then Hall got out of the shack and went toward the refinery. After Hall left, Davison attempted to put the cable back into the shack to get it off the railroad right of way, as he could not apparently load any coke. He was stopped by Casey from doing that, and told "to get the hell out of here," and "Leave that stuff alone." Casey would not allow Davison to put the tools away. Davison then left the ramp and went over to the highway; stayed there until the truck loaded with coke arrived. When it did, Freitas, the driver of the truck, pulled off parallel to the highway, seeing there was no railroad car to dump it into. All the time there were other strikers gathering at the ramp. At the time the truck arrived, Davison counted up to 60 men, and estimated there were at least 100 there. A group gathered around Freitas and told him they would upset the truck because he had gone over the picket line. Two or three said, "Let's put the truck driver back inside the truck before we tip it over and let him

dig himself out of the coke." Davison then pleaded with the men, asking them to let the truck go back to the refinery and dump its load there, and they permitted the driver to get back in the truck and go in the direction of the refinery. Davison then again attempted to put the cable back, when he was stopped by Frank Casey again and told to get the hell off of this property, so Davison went back up the highway. Then a deputy sheriff arrived, but he only stayed a couple of minutes and then left and parked his car about 50 yards south of the ramp. Davison then went and talked to the deputy, then returned toward the ramp, and was addressed by strikers who threatened him from time to time, calling him a scab, and saying they should beat him up and teach him a lesson. A little later, some of them started throwing rocks, and one of them hit and broke a light bulb on a standard near the ramp. Another deputy sheriff drove up and remained for about 20 minutes. A car drove by along the highway, the man in it taking pictures. Rocks were thrown at that car; several rocks hit the car. Shortly thereafter, Hall and Mr. Ahnberg of the Collier company drove up from the direction of Oleum in a station wagon. Davison got in the car with them. Casey spoke to them; he was again the spokesman of the group. He said, "Are you going to try to load any coke?" Hall said, "Not today." Casey said, "Are you ever going to try to load any coke while the strike is going on?" Hall said, "I am certainly not going to try and load any coke under these conditions." While Casey was talking to Hall, there were quite a few hollering at the same time and threatening to tip over the car the three were in, and several of them were rocking the car, tilting it. As Davison, Hall and Ahnberg drove away (about noon of that day) rocks were thrown at their car and a couple of the rocks hit the car. They went back to the refinery, Davison to the coke pit, where he was about 15 minutes. Later, he returned to San Jose, going past the ramp near Rodeo about 1 o'clock. On their way back through Rodeo toward San Jose, there was no one around the ramp.

Hall's testimony was substantially the same as Davison's concerning what happened while Hall was at the ramp with Davison. He further testified that when, in response to Casey's inquiry, Hall said he intended to move coke, Casey said, "You are not going to move the coke this morning; I will have 200 men down in two minutes that says you won't move the coke," and that Casey turned around and told someone

to go up to the hall and get the boys. Hall testified he had previously met Casey, when Hall was before the strike committee a couple of times, and during this discussion on the 27th Casey said to Hall, ''We have been awful nice to you in a lot of respects and we are asking you not to move this coke in a nice way,'' and that we (Hall and Davison) were not moving the coke, that they would beat the hell out of the truck driver if he came down to the ramp, and all the rest of us that were around, and Casey said, ''That is a threat,'' and asked Hall what he intended to do about it, to which Hall said he would have to go up and find out what he was going to do; and then Hall left the ramp and went to the refinery where Ahnberg (vice-president of the Collier company) then was. Davison testified that about September 17 he and Hall met with the strike committee at the union's headquarters, at which meeting Casey, Marcos and Coughlan, among others, were in attendance.

Freitas testified that as he drove his truck into the coke pit area at the refinery he was stopped by pickets at the entrance who wanted to know what he was going to do. He told them he was going to haul some coke for the Collier Corporation. They told him he wasn't allowed in there, and he replied that his local teamsters' union from San Jose said he could go through that picket line and he went in. While his truck was being loaded with coke, two cars drove up and stopped on the highway near by, and one of the men asked who was running the trucking part there. Freitas went to talk to them and they told him they weren't going to allow him to haul any coke and that they were quite desperate about it. They told him there were 1,100 desperate men, they just didn't intend to let him haul any coke, and he said, ''Well, I intend to haul it.'' They said, ''We are not only warning you, we are threatening you,'' and then they drove away. As he entered the highway from the coke pit area, after loading his truck, some pickets told him he was in for a warm reception. He then drove down to the ramp near Rodeo and noted, when he got there, that the gondola car was not at the ramp, so he just stopped in front of the ramp. Some people came over and talked to him, including the man who talked to Freitas near the coke pit, and others who were in the two cars back at the refinery. They said, ''We warned you not to come down here,'' and ''We might just as well turn the truck over.'' And some of them said, ''Let's let them go back,'' and there was argument pro and con, and Mr. Davison came over and

started talking, and finally they let Freitas go back and unload (at the refinery), which Freitas did. Freitas' estimate was that there were, roughly, 60 men at and near the ramp. He did not see any officers near the ramp at that time. He went back to the refinery, encountered no interference at the picket line in returning. After unloading, he had some lunch and was there at the refinery close onto an hour. On his way home (toward San Jose) he passed the ramp at Rodeo about 12:30 or 1 o'clock. There was no one at the ramp that he could see at that time.

Davison and Hall identified Tom Coughlan as one of those present, at least a portion of the time, at the loading ramp on the 27th, and Hall identified McKeown as being near the ramp on one of Hall's trips to the ramp. Casey was financial secretary and business agent, and a member of the strike committee, of the Local Union. He was served with the order to show cause and restraining order on September 14, 1948. Coughlan and McKeown were members of the strike committee of the union and were served with those two orders on September 15.

Casey denied being near the ramp on the 27th around 10:30 in the morning or at any time except for a time between 11 and 12 o'clock; denied having any knowledge of the events related by Davison; said he was not there when Davison and Hall were working on the winch and cable; did not even know Hall or Davison, or Freitas, although he may have seen one of them sometime but did not know him; said he had never heard any such statements that were ascribed to him, Casey; that he was at the union hall that morning and somebody said there was trouble over there (at the ramp) and he came over, drove over, stayed not over 30 minutes, sat in his car all but about 5 minutes, then went directly back to the union hall in Rodeo. He said he saw approximately 15 people there, present there; that he parked about 50 feet from the ramp and Mattos, a union member, came over to his car and said the trouble was all over.

Petitioners claim that the evidence against Casey is too slight to sustain the judgment. They predicate this claim upon Casey's denials and upon conflicts on incidental points produced by the testimony of other witnesses, such as the estimate by two deputy sheriffs (who were at or near the ramp but a part of the time) that about 25 people were there (instead of the 60 to 100 estimated by Davison, Hall

and Freitas). But the evidence which supports the judgment is substantial, and the function of resolving the conflicts was that of the trial court, not that of a reviewing court. The trial judge saw the witnesses, heard their testimony, determined their credibility, and weighed the testimony of each with that of the others.

A further question is presented by the fact that this ramp near Rodeo is about one mile from Oleum and respondent's refinery. Were the acts done and the threats made at and near the ramp within the territorial scope of acts proscribed by the temporary restraining order? The first paragraph of that order, as we have already indicated, concludes with the phrase ''while entering, attempting to enter, leaving or attempting to leave plaintiff's refinery at Oleum, Contra Costa County, California,'' a phrase clearly that modifies all that precedes it in that paragraph. Similarly, the sixth paragraph (which enjoins interference with the movement of automobiles, trucks, railroad trains or other vehicles) concludes with the qualifying phrase ''which enter or leave or attempt to enter or leave or are about to enter or leave plaintiff's refinery at Oleum, Contra Costa County, California.'' If all that happened in connection with this episode occurred only at the ramp, a mile distant from Oleum, petitioners' claim that such acts were not proscribed by the restraining order would probably be good. But that is by no means all that happened.

It is not the interference with the loading of the gondola car near Rodeo that is the gist of the charge. It is the interference with, and the threats concerning, the removal of the coke from the refinery. The testimony of Freitas concerning the threats and warnings given him at the refinery premises (against moving the coke), coupled with the threats given Davison and Hall by Casey (at the ramp), followed by the threats to dump the truck (compromised by suffering Freitas to haul the coke back to the refinery, which he did), quite clearly produced in the mind of the trial judge conviction beyond a reasonable doubt that this series of events constituted but a single transaction, that of intimidating, obstructing, molesting and harassing persons doing business with the respondent while entering and leaving the refinery, and of interfering with the movement of a truck entering and leaving the refinery, and that Casey (who had notice and knowledge of the restraining order and its provisions) was an active participant therein and directed the proscribed activities. The

evidence would support such a finding. The trial judge made the finding. A reviewing court cannot reweigh the evidence and undertake to disturb that finding. The trial court had jurisdiction to render the judgment which it entered against Casey on the Davison complaint.

*The Hemmen complaint*, an affidavit by G. H. Hemmen, filed October 14, 1948, alleged that the International Union and the Local Union and Frank M. Casey, James P. Kenny, Walter V. Holt, Montell H. Bullock, Stanley Shulman, Herman Phillips, Jr., Curtis C. Page, Clifford Kierstad, Elmer E. Smart, Frank M. Silva, and Ernest Swan, on September 28, 1948, at Oleum, violated the restraining order in that they intimidated, molested, harassed and threatened bodily harm to and threw rocks at J. W. Buddenberg, John Norton, Robert Diehl and other employees of plaintiff who were then on the property of the refinery of plaintiff.

The court found all of the allegations true except that Shulman, Kierstad and Swan at the time alleged had neither notice nor knowledge of the restraining order or its provisions; dismissed as to Shulman, Kierstad and Swan; and adjudged each union and Casey, Kenny, Phillips, Silva, Bullock, Page and Holt guilty of contempt of the authority of the court. As punishment therefor, the court ordered the International Union to pay $500, the Local Union $150; Casey and Kenny, each, imprisonment two days in the county jail and a fine of $50; Phillips, Silva, Bullock, Page and Holt, each, to be imprisoned one day in the county jail.

Substantial evidence was adduced that would probably support the judgment if the complaint stated facts sufficient to show upon its face the commission of acts enjoined by the restraining order, except that we doubt if there was substantial evidence that Holt and Bullock had knowledge of the pertinent provisions of the order. Counsel for the respondent company direct attention to the fact that Holt did not take the witness stand to rebut the prima facie showing against him and that Bullock's evasiveness on the witness stand (when testifying concerning his participation in the picketing activities charged in the Ritchey complaint) was evidence that each, respectively, possessed such knowledge. Whatever evidentiary value such conduct may have (assuming but not deciding that Bullock's conduct in the Ritchey case was evidence in the Hemmen case), we do not consider that such conduct alone, unaided by other evidence on the subject, amounts to substantial evidence that either Holt or Bullock had the requi-

site knowledge to support a finding that they disobeyed the order of the court.

However, a question as to the sufficiency of the complaint to state facts constituting contempt is presented. Were the acts charged proscribed by the restraining order? Those acts were: Intimidating, molesting, harassing, threatening bodily harm to, and throwing rocks at, certain "employees of the plaintiff who were then on the property of the refinery of the plaintiff." These are essentially the same allegations as those of the Diehl complaint, and insufficient for the same reasons as those of the Diehl complaint are insufficient.

We conclude that jurisdiction to render judgment on the Hemmen complaint was wanting and that the judgment should be annulled.

*The Ritchey complaint,* an affidavit by Donald Ritchey, filed October 14, 1948, alleged that the International Union and Local Union, and William F. Waldren, Montell H. Bullock, Albin Erickson, Mansfield B. Lowery and Charles A. Madison, on October 4, 1948, at Oleum and Tormey, violated the restraining order in that they intimidated, molested, harassed and threatened bodily harm to, and threw rocks at the train crew of the Southern Pacific Company and other employees of that company while the crew was operating the train from plaintiff's refinery; that while the train was leaving the refinery they stationed themselves as pickets for the purpose of accomplishing the foregoing acts and of interfering with the movement of the train; that in the course of said acts and with the intent to accomplish said acts they struck Stanley Bray, one of the employees of the Southern Pacific Company, with a rock.

The court found all of the allegations true except that the International Union on said day did not violate the restraining order and that Waldren, Erickson, Lowery and Madison on that occasion had neither notice nor knowledge of the restraining order or of its provisions; dismissed as to the International Union, Waldren, Erickson, Lowery and Madison; and adjudged the Local Union and Bullock guilty of contempt of the authority of the court. As punishment therefor, the court directed the Local Union to pay a fine of $175; Bullock to be imprisoned in the county jail for two days following the end of the term imposed upon him in the contempt proceeding based upon the G. H. Hemmen affidavit.

On October 4, 1948, a Southern Pacific crew took an engine and caboose from Oakland to Oleum and thence easterly to

Selby, where they did some switching. Then they returned to Oleum, picked up 40 freight cars and hauled them from the refinery easterly through the tunnel toward Selby. The train stopped for a few minutes after it emerged from the east portal of the tunnel, and then proceeded and again stopped, with the engine at Tormey Crossing, a point near and westerly from Selby. After a time the train proceeded easterly, beyond Selby. The railroad tracks between the tunnel and Tormey Crossing run close to the water's edge. Prior to and during the time that the train moved back and forth between the tunnel and Tormey Crossing, there were three rowboats in the waters of the bay, near the shore, in this area. In these three boats, respectively, there were five, four, and two men.

Among the men in the boats, the witness Fifer recognized Lowery, Waldren, Erickson and Bullock; said that as the engine and caboose returned toward the tunnel, men in the boats made throwing motions with their arms, motions which he illustrated by demonstration in court, identified Waldren as making such motions. He observed that, as the engine with the string of cars passed from the tunnel to Tormey Crossing, these throwing motions were repeated by men in the boats, as though they were throwing rocks at the train. The boats followed the train a considerable distance toward Tormey. He said the two-man boat (Bullock and Waldren in it) carried a sign reading "Strike Picket"; so also did the five-man boat, the one Erickson was in. Shown a photograph (Ex. 34), depicting two boats, this witness identified Waldren and Bullock in one boat, and Mock, Erickson and Madison among the five in the other. Shown another photograph (Ex. 35), he identified Lowery as one of the four men in the boat there portrayed. The witness Bower testified to substantially the same facts as did Fifer. Bower observed Erickson and Waldren making throwing motions, saw rocks hit the engine and caboose, and observed that when the engine with the string of cars left Tormey, going easterly, the boats went back, around the pier, toward Rodeo. The witness Eber testified to the same effect as did Fifer concerning the train movements and the men in the boats making throwing motions. The witness Stanley Bray was riding in the engine cab, described the train movements and testified that he was hit in the head by a hard object which caused a scalp wound and bleeding. He did not see that object coming but observed the fireman (who was on his left, between him and the bay) move out of the way, off of the seat box, and the witness was hit from that

side. The engine was 100 to 200 feet east of the tunnel at the time. Ritchey testified that 8 to 10 rocks were thrown. He heard rocks striking. During part of the time the boats were 50 feet offshore and within 70 to 75 feet of the train; saw one of the men in the two-man boat throw two rocks, observed all of the men in the five-man boat throw rocks.

Bullock testified that he and Waldren planned a fishing trip the night before and that day fished possibly an hour opposite the Southern Pacific depot at Oleum, then for a time right off from the Union Oil dock, then over to Selby Flat but there an oil spill interrupted their fishing. So, then they went in between two of the Union Oil wharves, and there were possibly four boats in there. Then a railroad engine came along and started switching into Oleum, "and so we thought possibly that they were going into Oleum to haul out some tank cars of gas and oil or something . . . and we swung along as near to the switch as we could, to see what was going on; and it was quite apparent that these fellows were going in and get these cars; so we immediately started following the train down along the track and started hollering and trying to ask the engineer or the men that was on the train . . . not to go in there, because the company was on strike . . . " As to what happened after the engine returned with a string of cars, he could not say that very much happened, did not see anyone throw rocks; if any rocks were thrown at the train, he did not know; he saw Waldren (in the same boat as Bullock) throwing two or three times but did not know what the object was, might have been rocks or most anything; on that day, he had no knowledge of the restraining order; no officer or member of the strike committee of the union, or anybody else, told him and Waldren to go out in the water that day; and Bullock threw no rocks, and could not say there were any rocks in his boat, he noticed none when he got in and did not see any when he got out of the boat. Waldren said he threw a couple of rocks as the train was going easterly; the rocks were in the boat when he got in it, not more than three; he had heard about the restraining injunction, but only about four pickets to the gate, heard several fellows talking about the injunction around the union hall and various places, it was the subject of conversation along with other things such as how the strike was progressing. Lowery said the boys were talking about going fishing and so he volunteered to take them out; they fished for one to one and a half hours and then the current became swift because of the tide,

so they stopped fishing, and as they passed the wharf they saw a bunch of cops along the shore and went in to see what was going on; saw two or three boats anchored by Selby; a half hour later, saw a train coming out of the tunnel; stayed around an hour; threw no rocks himself and did not believe any of the others in his boat did, and had no recollection of noticing anyone in the other boats throwing rocks; had read in the paper about the injunction but thought it pertained just to Union Oil people alone, not to the Southern Pacific. He recognized himself in a photograph (Ex. 35), in a boat, at the rudder, and the man in the front of the boat holding a sign, a picket sign; said that "every boat had a picket sign in it, no matter where you went" and you raised the sign after you got there. Erickson testified he was at the union hall in the morning of that day; was scheduled for picket duty at one of the gates at the refinery in the afternoon; he and Madison went for a walk, down to the bay, and Mock asked them if they would like to go out in a picket boat and do a little picket duty; so they went back to the union hall for lunch and the witness notified their picket captain they were going out in a picket boat as soon as they left; that when he heard about the train coming in he decided to ask to have his assignment transferred to the boat; he guessed it was all right with the picket captain, and he told the captain he was going out and picket in the boat. (The union's picket list [Ex. 75-B] bore Erickson's name among those listed for picket duty that afternoon, marked "P," indicating he reported for duty, and opposite his name the word "Boat" was written in.) Mock, Erickson, Madison and two others went out in the same boat, the five-man boat shown in one of the photographs (Ex. 36). They proceeded from near Rodeo, around the Union Oil wharf, toward Tormey Flat; as they proceeded the talk was that if they put a picket sign up and threw a few rocks they might be able to scare the crew of the engine and maybe the crew would change their mind and not take the cars out; the train arrived after they did, coming through the tunnel; the engine looked like it was going to couple onto these tank cars, and the boats were kind of circling around, and they started to throw a few rocks at the engine. Erickson threw about three rocks. The "engine did get the cars and pulled them out, and so we exploded there for about five or ten minutes, and then we proceeded around the Long Wharf again and then back to the dock." He said the other boats did not leave the port at the same

time as his, "It was 10 minutes either way, I think maybe we were the first one out; I believe so." He said the only thing he knew, that day, about an injunction was talk about something that limited picketing to four men to a gate. Others in his boat threw rocks; the rocks were in the boat when he got in it; the boat was 50 to 100 feet from the train when the rocks were thrown. Madison's testimony was substantially the same as Erickson's. Madison said Mock "asked us if we wanted to go out in the boat, because he was going to go over and picket the train, and we thought we would. So, we waited around there for some time. They were making preparations with the boat." After he got into the boat he noticed some rocks, a box of rocks, on the floor. Madison's name also appeared on the picket list (Ex. 75-B) and opposite it the letter "P" and the word "Boat" penciled in.

We find here substantial evidence in support of the finding that Bullock violated the restraining order, save as to the element of his knowledge of its pertinent provisions. Counsel for the respondent company invoked the evasiveness of Bullock (in this case as in the Hemmen case) as substantial evidence that he possessed such knowledge. We do not consider that such conduct alone, on the facts here presented, furnishes substantial support for such a finding. We conclude that the judgment against Bullock on the Ritchey complaint was without jurisdiction and should be annulled. It does not necessarily follow that the judgment against the Local Union, on the same complaint, should be annulled.

*As to the Local Union,* adjudged in contempt of court upon each of the six complaints, we have but four to consider in view of our conclusion that the Diehl and Hemmen complaints stated facts insufficient to confer jurisdiction to render judgment. As to those four, there can be no question concerning the Local Union's knowledge of the temporary restraining order. The union was a party defendant in the action and was served on September 14, 1948, with copies of the restraining order, order to show cause, and the affidavits and memorandum of points and authorities upon which those orders were based, as well as the summons and complaint in the action.

The principal question, in each case, is whether or not the Local Union bore such a relation to the transaction that it was a participant, directly or through its member actors, and legally responsible for the acts done, as acts enjoined by the restraining order. That is the scope and extent of the inquiry. We are not at all concerned with the question

whether the union might or might not be found legally responsible, upon the same set of facts, in a civil action for alleged damages or in a criminal action for an alleged violation of some provision of the Penal Code.

 In respect to the judgments of contempt rendered against the Local Union on the Davison complaint, it is clear that the evidence in support of the judgment is substantial. Casey was financial secretary and business agent of the union (its one full-time officer) and a member of its strike committee. He was the principal actor in that transaction and director of it. The evidence supports the implied finding of the trial court that his acts upon that occasion were the acts of the Local Union. There is additional evidence that tends to support the judgment against the Local in the Davison case; also, those rendered in the Grant, Briggs and Ritchey cases.

A. A. Marcos, president of the Local Union, testified that the elective officers of the union consist of the president, first and second vice-presidents, financial secretary, recording secretary, guide, guard, a grievance committee of 11 members, and three trustees; that there is an executive committee consisting of the elective officers; and that a strike committee was set up September 3, or 4, 1948, consisting of A. A. Marcos (president), J. P. Kenny (first vice-president), G. A. Malkos (second vice-president), Frank Casey (financial secretary), Loyd Cooper (recording secretary), John Mc-Keown (guard), L. J. Kenny (trustee), J. L. Bradley, William Law, Tom Coughlan, Frank Devine, and W. E. Bates (the last three were members of the grievance committee); and that Bradley and Law replaced Leo Doty and Harold Lowery, original appointees who had resigned. There was also a negotiating committee, which consisted of A. A. Marcos, Frank Casey, Loyd Cooper, and Frank Devine. There was a welfare committee to find food and housing for members and to screen applications for financial assistance; it had no function with reference to picketing.

The strike committee, said Marcos, had the authority of conducting the strike, subject to the approval of the membership at regular meetings held once a week; they had members picketing at other places than Oleum but assigned only their own members to picket at Oleum; that Marcos did not have authority over anything or anybody, individually or as president of the union; the general conduct of the strike was the responsibility of the strike committee; none of the members of

the strike committee had specific duties, they did whatever it was necessary to do, "We just handled matters as they came up"; the picket captains were appointed, as were the members of the strike committee, by a joint committee (the executive board and the grievance committee) subject to the approval of the local, the governing body of the union; the strike committee instructed the pickets to limit picketing to four at each gate, instructions that were given the picket captains who were told to pass these instructions along to the pickets assigned to their shifts.· When giving those instructions, said Marcos, they told the picket captains they had been served with an injunction and the injunction said there shall be no violence of any kind and the pickets shall be limited to four to each gate, and they told the captains to follow those instructions; it was the duty of the picket captains to carry out those instructions and to advise the pickets; all the pickets were members of the Local Union; picket lists were prepared by the coordinating committee, headed by Mr. Alt, and the lists were handed to the captains, who administered the lists; the captains first selected were William Ahern, Lou Cargo, Bill Law, and Elmer Smart, and possibly one or two others, with some changes later on; the captains had helpers, called lieutenants, selected by the captain. Shown a list of names of persons, which bore the legend "Wednesday 8 A M to 4 P M" and "Sept. 15, 1948," Marcos said it was a picket list for the day indicated and that the names listed were of members assigned to picket duty during the hours indicated; the entry "P" after a member's name indicated he answered for duty down at the hall; not all on the list who answered did picket duty, some were given other assignments, and some did picket duty whose names did not appear on the list. Marcos said he received his copy of the restraining order on the 14th of September, read it and offhand did not understand what he was reading; that on September 16 Casey and Cooper went to San Francisco and met with their attorney, Lindsay Walden (that Aljets, who served the papers, said he would give them a day or two to get some legal advice), to get a clarification of what was meant; they did not post the restraining order at the union hall, nor did the witness recall having any discussion of the restraining order at any meeting of the union; "The membership of the Committee discussed the advisability of attempting to interpret it and we decided against it for the reason that at that time thorough the press and through letters to all the employees of

the Company the Company was using every weapon that they had in their command to put out the story to the members, and we felt this injunction was just another move on the part of the Company to break the strike and weaken the morale of the members, and none of us had a clear enough understanding of the injunction to act as interpreters. As a matter of fact, we had been advised by our regular counsel that probably all the members were going to be served now; that seemed to be what was done in the southern part of the State and there was no reason why it shouldn't hold true up here. So, we did not post it, did not discuss it, and certainly didn't advise anyone of it. What we did do is this: As we assigned pickets to the line, we told them there should be absolutely no violence, and not more than four pickets to a gate. That was all we did, and we maintained that and we still do; that there should be nothing more than peaceful picketing up there, and there should not be more than four men on any gate. As to the rest of the injunction, right now I can't tell you what is in it.'' He said they reduced the number of pickets at the gates to four on September 15 or 16.

As to picketing by boats, Marcos believed there was some picketing around Petaluma and around the Port of Oakland, and out in the channel off of Oleum as the tankers were approaching the docks; if boats were picketing tankers, he imagined they would have signs. Before September 15 he never saw any boat picketing within 100 feet or so of the Union Oil property; he did not instruct or authorize any persons to picket in the waters within 200 feet of that property before September 15; did not know about anyone else on the strike committee doing so, though he normally attended meetings of the committee when he was in this area; there were times when he was in Los Angeles, attending negotiations; he was at Rodeo September 15, 16 and 17, could not say whether he was at Rodeo on September 22, 26, or 27, or on October 4, 1948; that on the days he was away from local headquarters, first vice-president James P. Kenny acted in his place, and if Kenny were also absent, second vice-president Malkos would act. This witness did not know whether the strike committee at any time instructed Frank Silva to do anything.

Tom Coughlan, recording secretary and member of the strike committee of the Local Union, testified that the picket captains were appointed by the strike committee. He did

not know who was assigned to the picket boats on September 17, 1948. The minutes of the meeting of September 16, 1948, of the Local Union contained the following entries: Under "Report of the Boat Committee," an entry that "Brother Malkos reported for the Boat Committee as to the number of boats we have working for our efforts and their duties"; under "Report of the Co-ordination Committee," the entry that "Brother Alt again discussed the functions of the Co-ordination Committee regarding picket assignments and office force duties"; and under "Report of Publicity Committee," the entry that "Brother McCord discussed the functions of a publicity committee, saying that local and immediate news is published, that all press releases would come from the International. The paper is called 'Off Stream.' Human interest stories, committee functions and picket line news will be featured." G. A. Malkos (second vice-president and a member of the strike committee), who made that report for the boat committee, testified that he had some authority over the boats; assigned some boats on the bay on September 16 for fishing and they had picket signs on them also; did not know that he did so on September 22, could not remember what happened that day; during the last two weeks in September he did not make any assignments, there were some boats out there with picket signs on them, he did not tell them to do anything; he had so much to do he would not say he gave definite orders for anybody to go out there in September or October; he knew there were boats out there during the first week in October with picket signs on them, they may have been fishing; these boats sometimes went to Oakland or Petaluma or various other places around the bay; he knew when they were going to Petaluma and Oakland and various points in the bay.

Harold Alt, chairman of the coordinating committee, produced picket lists for the various days upon which violations of the restraining order were charged, and explained the lists and their use, as did Marcos. The entry "P" opposite a man's name indicated "Present," that he responded for duty, at the union hall; the captains detailed the men to the picket gates. On the picket list for September 17, opposite "M. P. Lowery" (one of the members charged in the Grant complaint) the word "Boat" was entered. The witness did not know for sure what that entry meant. (We have, above, noted similar entries opposite the names of Erickson and Madison on the picket list for October 4, 1948.)

The strike was voted on September 4, 1948, by 90 per cent

of the approximately 1050 members of the Local Union, according to the witness Marcos.

Here is presented a picture of an organization that by vote of its membership authorizes a strike and by and through its elected officials and specially constituted committees conducts the strike, giving its strike committee general authority to conduct the strike subject to approval of the members expressed at regular weekly meetings, using pickets selected and listed by a duly constituted coordinating committee and assigning the pickets to their stations and supervising them through picket captains duly appointed for that purpose; using, also, a boat committee, as evidenced by the minutes of the meeting of September 16 and by certain issues of the union's news bulletin. The testimony of the officers and strike committeemen concerning assignments to strike duty by boat was somewhat evasive, but they did say that such assignments were made for the picketing of tankers in the channel and at Petaluma and the Port of Oakland and that the boats carried picket signs, and none said that no assignments were made for offshore picketing of railroad train movements in the vicinity of Oleum. Phillips' testimony that the union furnished the picket sign for his boat and the transfer of Erickson and Madison from land to boat picket duty with the sanction of th picket captain on the 4th of October, coupled with the circumstantial evidence furnished by the entries opposite their names on the picket list for that day, are added indicia which support the implied finding that the picketing by boat activities here involved were those of the union as an organization, not the activities of individual members of the union acting on their own. The duly constituted officers and committees of the union, clothed with general authority to conduct the strike (including the picketing) for and on behalf of the organization as a unit, cannot in good conscience, with knowledge of the restraining order and its provisions and early advice thereon by their attorney, withhold from the members, particularly those assigned to and performing picket duty, adequate information concerning acts enjoined by the restraining order. Those members were not acting merely on their own. They were acting for the union as an organization and would quite naturally look to their captains for guidance as well as for station assignments. The responsible and directing officers and committeemen could not suffer the communication of this information to the picket

men to break down at the level of the captains, and then say that neither they nor the union whose affairs they had in charge disobeyed the mandates of the restraining order. ■ That order was addressed to the Local Union and to four of its officers and six members of its strike committee (all parties to the action in which the order was made), and "restrained and enjoined" them "and each of them, their agents, servants, representatives, officers, employees, members and pickets" from "committing or performing directly or indirectly or by any means whatsoever any of" the acts proscribed in the seven paragraphs of that order quoted earlier in this opinion. A duty thus cast upon the union cannot be evaded by withholding from its agents, its representatives, its member-pickets, information quite evidently needed by them to enable the union to conduct its strike without violating the injunction.

■ Cumulative evidence to the effect that violent picketing activities were not mere sporadic outbreaks by individual members of the union, is furnished by the active participation and leadership of Casey in the prevention of removal of coke from the refinery. Indeed, such action by the financial secretary and business agent, a member of its strike committee and clothed with power to do whatever it was necessary to do in the conduct of the strike (as stated by president Marcos), was no mere closing of the eyes and suffering individual members sporadically to commit acts enjoined by the restraining order. Such conduct by this officer was evidence of a substantial character in support of an implied finding that the union encouraged and sanctioned disobedience of the court's order.

We conclude that the judgments severally rendered upon the Grant, Briggs, Davison, and Ritchey complaints, adjudging the Local Union guilty of contempt of the authority of the court, were supported by substantial evidence and were within the jurisdiction of the trial court to render.

■ The International Union was adjudged guilty of contempt of the authority of the court as a participant in the doing of the acts charged in the Briggs, Diehl, Davison, and Hemmen complaints. In accordance with our conclusion that the judgments in the Diehl and Hemmen cases were based upon insufficient complaints, those judgments should be annulled as to the International Union as well as to the other petitioners affected thereby.

■ The acts alleged in the Briggs and Davison complaints were committed on the 22d and the 27th of September, 1948,

respectively. The evidence is substantial that the International had knowledge of the temporary restraining order and its provisions on those dates, for it was served with copies thereof and of the moving papers and the summons and complaint in the action by service on O. A. Knight, its president, on September 17, 1948, and by service on J. Elro Brown, its district director, on September 20, 1948. Knight and Brown were also served therewith, on those dates respectively, as individuals.

The question in each of these two cases is whether or not there was substantial evidence that the International Union bore such a relation to the transaction as would and did characterize it in law a participant legally responsible for the acts done as acts enjoined by the restraining order.

The constitution and by-laws of the International Union for 1948-1949 are in evidence. That document indicates the relationship between the International and Local Unions and the members. A person attains membership in the International by becoming a member of a Local (art. X, § 3) and has the right of transfer of membership from one Local to another when he moves from the jurisdiction of the one to the other (X, § 10). The legislative and governing body of the International is the National Convention (III, §§ 6-12). Every member of the International is represented in the National Convention by the delegate or delegates chosen to represent his Local. The voting strength of the Locals is based upon their average per capita payments to the International. No member of a Local is eligible to serve as a delegate unless he has been a member in good standing of the International at least six months and of a Local at least 90 days, unless the Local has been organized less than six months (III, §§ 4, 9). The elective officers of the International are a president, a vice-president, a secretary-treasurer, seven International executive council members and seven International vice-council members. The president, subject to confirmation by the council, appoints seven district directors, one for each of the seven geographical districts of the International. (V, § 1.) The president presides at the National Convention, is chairman of the executive council, is chief administrative officer, and responsible for all activities of the International other than those assigned by convention to other elected officers, and plans and supervises all programs, negotiations and other activities necessary for the advancement and welfare of the

members. It is his duty to conduct all authorized strikes. He appoints all International representatives and organizers, and procures legal advice when necessary. It is his function to interpret the constitution of the International and decide all questions, laws and usages, and his decision is binding unless amended or reversed by the executive council or the convention. (VI, §§ 1, 2; IX, § 1.) . Minimum qualifications are prescribed for individual members (I, §§ 4, 5). The mandates of the International must be obeyed at all times and in it alone is vested the power to establish Local Unions and to regulate and determine all matters for their guidance, while to the Locals is conceded the right to make necessary laws for Local government which do not conflict with the laws of the International (I, § 2). The International executive council must revoke the charter of a Local in case of continued violation or refusal to obey the laws of the International (IX, § 3). Minimum and maximum rates for initiation fees and dues are prescribed by the constitution. Of the dues which the constitution requires each Local to collect from the members $2.50 per month, which a Local may increase to $3.00), $1.15 per month (until November 1, 1948, and thereafter $1.25) is a per capita tax payable monthly by the Local to the International but is at all times the property of the International; the remainder is the property of the Local, to be disbursed as the laws of the Local provide, subject to the International constitution governing the conduct of Locals. (X, § 6.) The constitution allocates these per capita revenues to certain funds (X, § 1). Defense fund moneys may be drawn only for the sustenance of lockouts and strikes of Local Unions when such strikes are authorized, endorsed and conducted in conformity with article XII of the constitution, which requires the recipients to report for strike duty as directed by the Local. During a strike, the International representative in charge must make weekly reports to the International showing amounts of money distributed and to whom paid. (XII, §§ 8-10.) If a Local desires that other Locals be circularized for financial assistance, it may appeal only to the International for that aid. If the appeal is found warranted, the International officers make the appeal to the other Locals. Money contributed must be sent to the International and is then forwarded to the Local, which shall account therefor to the International. (XII, § 14.) A standard set of by-laws is prescribed for each Local to govern its procedure until modified by the Local, except that certain provisions thereof are not subject

to change by the Local. No Local may declare the products of any oil company "unfair" or place such products on any "We don't patronize list," unless such action has first been submitted to and approved by the International executive council, which shall grant such authority on request whenever the International has abandoned efforts to reach agreement with such company in matters affecting any portion of its membership concerned (X, § 11). A Local may not call a strike without first calling a meeting thereon, with notice to all its members, nor unless three-fourths of the affected members by secret ballot decide on a strike. If they so decide, the president of the Local must notify the International president of the cause of the matter in dispute and all relevant facts. The International president must then endeavor to adjust the difficulty, and if his efforts prove futile he must notify the executive council, and if the council decides a strike is necessary the union shall be authorized to order a strike. No strike except on contract work is deemed legal or moneys expended from the International expense fund on that account, unless the strike is first authorized and approved by the International president and executive council. Strikes on contract work may be approved by the International president in the interest of expediency. (XII, §§ 1, 2.) In any question pertaining to the welfare of the organization as a whole, the International president, with the approval of the executive council, shall take such steps as will best preserve the interests of the organization, subject to a referendum vote of the Local Unions within 30 days when requested by 20 per cent of the Local Unions; a provision which the International president may invoke as a result of an unauthorized strike (VI, § 10). A Local Union inaugurating a strike without executive council approval shall not receive benefits on account of the strike. No monthly dues shall be collected from members affected during the period of a strike. (XII, §§ 4, 7.)

It is apparent that the constitution and by-laws vested in the International Union, acting through its International officers, the power to authorize a strike called by a Local Union, and cast upon the International president the duty to conduct all authorized strikes. That alone might not make the International legally responsible and amenable for acts done by its members or by one of its Locals in contempt of the authority of a court. We entertain the further inquiry whether or not there is substantial evidence in support of the

trial court's implied finding that in the instant case the International assumed its prerogative of conducting this particular strike.

This strike was authorized by the International. The witness O. A. Knight, president of the International, testified that ''Under the terms and provisions of the Constitution and with the representations that are implied therein, the International Executive Council authorized it, indicating by such authorization that, in their opinon; the further negotiations would not be fruitful, and that there was no use therefore proceeding with further negotiations.'' He further testified that other strikes were simultaneously called against other oil companies in California, including the Standard, Richfield, Associated, Shell and Texaco companies, and that the International approved the strike against each of those companies under the same conditions that it did the strike against the Union Oil Company. Eight oil companies were involved. On September 4, 1948, approximately 15,000 employees went out on strike.

About 9 or 10 days after September 4, President Knight arrived in California from his headquarters at Fort Worth, Texas. He was in the Contra Costa area for a number of days and met with various Local Union officials, and addressed meetings of members. He addressed an open air meeting of the Richmond Local at Richmond on September 15, and meetings at Martinez on the 16th and Richmond on the 28th of September. A recordation was made of the address delivered at the September 15 meeting at Richmond. That recordation was played in court and a portion thereof transcribed into the record. From that transcription it appears that International district director J. Elro Brown (his district included California and four other western states) acted as chairman, and in introducing President Knight as a speaker said that Knight ''has now set up headquarters in this district for the purpose of assisting, advising and directing the strike against the oil companies, or oil trust on the West Coast. Under the Constitution and By-Laws of the Oil Workers' International Union, all strikes are under the direction of the President, and our President is here to direct this strike against the oil trusts on the West Coast. It gives me great pleasure to introduce to you A. O. (Jack) Knight, President of the Oil Workers' International Union, CIO.'' In response to this introduction, President Knight's initial remarks were: ''Thank you, Mr. Chairman, and to the mem-

bers of Richmond Local Union of the Oil Workers' International Union: I wish to bring to you the rousing good wishes of the oil workers throughout the Nation and express the hope that you are able in this fight of yours to bring out of it the type of victory you set out to bring—that you are successful in bringing about a condition here in Richmond, California, where you can work for wages at least commensurate with those being paid to our workers throughout the Nation.'' During the course of his address, President Knight said: ''It has been suggested by a certain oil company official, not a member of the local Standard, that the control of this strike has gotten out of the hands of the Oil Workers' International Union, the implication being that the President of another organization is now directing it here. That statement is so absolutely ridiculous that insofar as I am concerned it does not need denial. (Automobile horns.) I wish, however, to assure all of the oil company officials that I am the President of the Oil Workers' International Union and I will continue to fulfill the duties of that office without interference from anyone, just so long as you see fit to continue to elect me to that office. (Applause.) This is our fight. It's a fight against the oil industries in the United States and it's particularly against the oil industries in the State of California. There is only one fight and only one union involved, and I think we're big enough to do the job we have set out to do.'' He said, further, that ''for a long number of years I have represented what I consider to be the greatest labor organization the world has ever produced—our own Oil Workers' International Union. We are going forward in this fight, not only here in Richmond, but we're going to continue in Rodeo. We are going to continue it at Avon, at Martinez, throughout the State of California until we have won this strike,'' and ''As I said earlier, we have but one fight and there's only one union involved, the Oil Workers' International Union against the oil industry of the State of California''; also, ''I'm going to conclude this little talk to you by again expressing to you the solid support of the oil workers throughout the Nation,'' and ''I am going to conclude, as I say, by assuring you that your International Union is solidly behind you 100%. You do your part, we'll do our part, and victory will certainly come, and this organization of ours will continue to grow. It will continue to carry out its function.'' These statements, some made by Knight, others made in his presence by Brown,

furnish substantial support for the implied finding of the trial court that the International Union, through its president, took charge of and conducted the authorized strike which had been called by the Rodeo Local against the respondent herein.

In addition, it appears by the testimony of Knight that he and his attorney, on the 14th or 15th of September, met at the Rodeo union headquarters and advised the Local leaders, who were asking about their legal right to institute picket lines around a plant adjacent to the Oleum refinery, a plant that supplied steam to the refinery, and the attorney advised against such picketing. It also appears by the testimony of Knight, Brown, and other International officers that the International solicited and received contributions from Local Unions and other persons and groups throughout the country and distributed the funds thus received through its International representative to the Rodeo union for financial assistance of members in need thereof. Knight said that the International did not thereby use its defense fund, which had been nearly depleted, but merely acted as a disbursing agency and that the moneys distributed were not in the nature of strike benefits. It was, however, an International Union activity conducted apparently in accordance with the provisions of the constitution relating to the solicitation and distribution of moneys by the International when requested by a distressed Local and approved by the International. Knight also testified that his personal activities in California consisted, principally, of assisting in the negotiation of new agreements with the oil companies, conducted at Los Angeles. Such activities alone might not furnish substantial evidence that the International exercised its power to conduct this strike, but they are not inconsistent with the independent evidence which tended to prove the exercise of that power upon the part of the International.

It is true that Knight upon the witness stand denied the material allegations of each of the six complaints, insofar as they related to the International, disavowed having had anything to do with the picketing conducted by the Local Union, or the selection or instruction of any of its pickets, or knowledge at the time of anything which any of the asserted individual contemnors did.

Knight further stated that it was his practice at all times to counsel peaceful picketing and respect for the law. His testimony concerning such counseling is somewhat impeached by the fact that the transcription in this record of the address

which he made at Richmond on September 15 shows that on that occasion he said that he and others had worked out an understanding whereby persons who had been going to work at the Standard Oil Company "will no longer attempt to take people through the picket lines of the Oil Workers' International Union," and that "out of these attempts to run people through the picket lines, there had developed between large numbers of people—there's developed the use of many things which we don't ordinarily use in strike situations. Because of this understanding, I am requesting this local union to no longer encourage in any way any situation which might result in violence, damage to property, or in danger to human beings. I am asking that *just so long as your picket lines remain inviolate . . .*" (Emphasis added.) Asked if he made such a statement on that occasion, Knight said he could not answer it "yes" or "no." Asked if he would deny making a statement to that effect, he said, "It is neither affirmed nor denied. My memory does not serve me quite that well, sir," adding that he always speaks extemporaneously and that he addressed that group at least 45 minutes.

The significant evidence bearing upon the International's legal responsibility is that furnished by the constitution and by-laws concerning the element of control over the Local by the International and the right of the International and the duty of its president on its behalf to "conduct all authorized strikes," and the statements by Brown and Knight at the Richmond meeting, which support the implied finding that the International, through its president, was conducting these strikes, including the strike against the respondent herein. Picketing, it is clear, was deemed an important part of the conduct of a strike. That part, in contrast to the negotiation of new agreements and the solicitation and distribution of funds for the assistance of members in need thereof, the parent body did not conduct immediately and directly by and through its International officers. It conducted that part of the strike through the Local Union and its officers and committeemen, and the member-pickets, as agents and representatives of the International. The parent body cannot escape responsibility for the acts of these, its agents and representatives, done in violation of the restraining order after the International received notice and knowledge of the order and its provisions. The same duty of guiding and controlling the acts of its agents and representatives in the observance of the

injunction rests upon the International as upon the Local in its relation to the individuals who were the member-pickets. It happened, according to the witness Marcos, president of the Local, that within a day or two of the service upon them of the restraining order two of the Local officials, Casey and Cooper, "went to San Francisco with copies of the injunction and met with Lindsay Walden [attorney to the International] and attempted to get from him a clarification of what was meant." In explaining why the Local officials did not specifically bring the terms of the restraining order to the attention of the membership at large, Marcos, among other things said, "As a matter of fact, we had been advised by our regular counsel that probably all the members were going to be served now; that seemed to be what was done in the southern part of the state and there was no reason why it shouldn't hold true up here. So, we did not post it, did not discuss it, and certainly didn't advise anyone of it," except to tell the picket captains there should be no violence, and not more than four pickets to a gate, and to direct the captains to pass those instructions along to the pickets. It would appear that the Local Union and the member-pickets acted in the line and within the scope of their authority as agents and representatives of the International Union, but without that degree of guidance, direction and control by the International officers which would enable the International, after it received notice and knowledge of the restraining order, to perform its duty of complying with the mandates of that order in the conduct by the International of this strike. We conclude, therefore, that the judgments severally rendered upon the Briggs and Davison complaints, adjudging the International Union guilty of contempt of the authority of the court, were supported by substantial evidence and were within the jurisdiction of the trial court to render.

2. *As to the Validity of the Temporary Restraining Order.*

Petitioners contend that the temporary restraining order was void because, they say, it prohibited peaceful picketing and included within its proscription acts of a character not presented to the court by the verified complaint and the supporting affidavits which furnished the factual basis for the issuance of that order.

The acts which petitioners committed for which they were adjudged in contempt of court were in disobedience of that portion of the restraining order which forbade them from

"threatening bodily harm or injury to" plaintiff's "officers, agents, employees, customers, or any other persons having business with plaintiff, or attempting to serve" plaintiff "while entering, attempting to enter, leaving or attempting to leave plaintiff's refinery at Oleum . . ." No one claims, nor could anyone successfully claim, that such acts constitute peaceful picketing or that they come within the constitutional guaranty of freedom of speech. Nor could a claim successfully be made that such acts were not of the type specifically described in the verified complaint and the supporting affidavits.

It is unnecessary to decide whether or not other provisions of the restraining order might be construed as prohibiting mere peaceful picketing or as prohibiting conduct not within the scope or of the type of acts described in the complaint and the affidavits.

*In re Bell,* 19 Cal.2d 488 [122 P.2d 22], was a habeas corpus proceeding for the review of a judgment rendered upon the conviction of petitioners for violating a county ordinance which proscribed certain types of picketing. The Supreme Court found that petitioners could have been lawfully convicted only under that portion of the ordinance which read as follows: " 'Section 3. It is unlawful for any persons to beset or picket the premises of another, or any approach thereto, where any person is employed or seeks employment, or any place or approach thereto where such employee or person seeking employment lodges or resides, for the purpose of inducing such employee or person seeking employment, by means of compulsion, coercion, intimidation, threats, acts of violence, or fear to quit his or her employment or to refrain from seeking or freely entering into employment.' " (P. 491.) The Supreme Court further found that those provisions of the ordinance were valid in part and invalid in part. That part which prohibited picketing by acts of violence was deemed valid. The court considered that part separable from the invalid portion, and because petitioners failed to show whether the acts for the commission of which they had been convicted were proscribed by the valid or by the invalid portion of the ordinance, the court concluded that the petitioners had failed to meet the burden which the law cast upon them of showing that the trial court did not have jurisdiction to render the judgment under review.

The same principles and a like line of reasoning apply to paragraph 1 of the restraining order and the judgments of

contempt under review in the instant proceeding. In addition, it is manifest that the judgments of contempt here involved were based upon disobedience of the valid portion of the restraining order, assuming for the purpose of this phase of the discussion, but not deciding, that some other portion of the restraining order may have been invalid.

In this case, as in the Bell case, the sole inquiry is whether or not the trial court had jurisdiction to render the judgment which it did render,—quite different from cases of direct attack of a judgment upon appeal, some of which petitioners have cited in support of their position upon this point, but which we consider inapplicable here.

3. *Applicability of the Restraining Order to the Local and International Unions, Unincorporated Associations and Enforcement as to Them of the Provisions of That Order, if Applicable.*

The Local and International Unions claim that because they are unincorporated associations neither is an entity; hence, neither of them is a "person" within the meaning of the applicable statutes. It necessarily follows, they say, that the trial court was without jurisdiction to render judgment of contempt against them, and that each such judgment as to either of them was void and should be annulled.

We do not so view the law. Each union was in court as a party defendant in an action in which the plaintiff sought an injunction against each union restraining the conduct of certain types of picketing. Each was in court as a party defendant by virtue of a statute which declares that "When two or more persons, associated in any business, transact such business under a common name, whether it comprises the names of such persons or not, the associates may be sued by such common name, the summons in such cases being served on one or more of the associates; and the judgment in the action shall bind the joint property of all the associates, and the individual property of the party or parties served with process, in the same manner as if all had been named defendants and had been sued upon their joint liability." (Code Civ. Proc., § 388.)

When such an association becomes a party to an action, it necessarily follows that the court acquires jurisdiction over it to the same full extent as the jurisdiction it has over any other party during the pendency of the action. This includes the jurisdiction and authority of the court to "determine any controversy between parties before it, when it

can be done without prejudice to the rights of others, or by saving their rights; . . ." (Code Civ. Proc., § 389.) Among the powers of a court is that of compelling "obedience to its judgments, orders, and process, and to the orders of a judge out of court, in an action or proceeding pending therein." (Code Civ. Proc., § 128.) The authority and jurisdiction of the court includes the power of a judicial officer "To preserve and enforce order in his immediate presence, and in proceedings before him, when he is engaged in the performance of official duty" and "To compel obedience to his lawful orders as provided in this code." (Code Civ. Proc., § 177.) "For the effectual exercise of the powers conferred by the last section [§ 177], a judicial officer may punish for contempt in the cases provided in this code." (Code Civ. Proc., § 178.) "An injunction is a writ or order requiring a person to refrain from a particular act. It may be granted by the court in which the action is brought, or by a judge thereof; and when granted by a judge, it may be enforced as an order of the court." (Code Civ. Proc., § 525.) Section 526 of the Code of Civil Procedure enumerates the types of cases in which an injunction may be granted, including the case "When it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action." These statutes furnish ample sanction for the issuance by the trial court of the restraining order in question, an order directed to the Local and International Unions as parties to the action, ordering them to refrain from the doing of certain acts.

Such an order of a court would be ineffectual in many cases were not some means of enforcing its requirements provided. Various means of enforcement have been provided by statute. Certain types of contempt of court (including "Willful disobedience of any process or order lawfully issued by any court") are made punishable as misdemeanors by section 166 of the Penal Code, enforceable through the ordinary processes of a criminal action. Another method of enforcement is provided by sections 1209 to 1222, inclusive, of the Code of Civil Procedure. Section 1209 declares that "Disobedience of any lawful judgment, order, or process of the court" is a contempt of the authority of the court. The remaining sections of this group prescribe the procedure which was invoked and followed in the proceeding which culminated in the

judgments of contempt here under review. This type of proceeding is not a criminal action or proceeding. It is a special proceeding, criminal in character, governed by the provisions of the Code of Civil Procedure, not by those of the Penal Code; not for the punishment of an offense against the state, but intended to implement the inherent power of the court to conduct the business of the court and enforce the lawful orders of the court. (*Bridges* v. *Superior Court,* 14 Cal.2d 464, 473-477 [94 P.2d 983].)

 But, say the petitioners, sections 1209 to 1222, inclusive, were not intended by the Legislature to apply to unincorporated associations because by their terms they apply to "persons" and section 17 of the code does not include unincorporated associations in its definition of "persons." That section says that "the word 'person' includes a corporation as well as a natural person." That is not to say that the word "person" under no circumstances includes an unincorporated association. The statement that the word person "includes" a natural person and a corporation leaves open for consideration what other types of entities that word includes when used in a particular context to meet a given situation. The word "includes" is not ordinarily a word of limitation but rather of enlargement. (*Johnson* v. *Monson*, 183 Cal. 149, 152 [190 P. 635] ; *Fraser* v. *Bentel,* 161 Cal. 390, 394 [119 P. 509, Ann. Cas. 1913B 1062].) The Legislature used it as a word of enlargement in section 17.

 Now, of course, in a proceeding under sections 1209 to 1222, inclusive, it must appear that an unincorporated association when involved as a party defendant must be such a person as possesses the capacity to obey the order under consideration. Without that capacity there could be no "disobedience" of the order. That each of these two unions had that capacity abundantly appears from the facts adduced at the trial, discussed earlier in this opinion. It is not a case of a simple partnership where in dealing with others each active partner has a legal right to act for all of the partners and bind the firm. No member of these unions could, merely as a member, go to the union hall at Rodeo, take over and conduct the business of the union, nor could he go to the International headquarters at Fort Worth and assume and exercise the powers of the International vested in its president by the constitution and by-laws of that body. Each union has its own well-defined functions and bears a certain

relation each to the other, and each of them toward the members. Each has all of the aspects of an entity. Each, in a very practical sense, is a real person, especially in its dealings with others. Each exemplifies the fact that labor unions are no longer the small unimportant organizations they were once considered. The labor union is a developing institution and with its tremendous growth in importance and power has come to be more akin to the corporation than the partnership or the social or fraternal order. Recently, we had occasion to consider this trend and development and found that, for the purpose of venue, a labor union's place of business is its residence.* In fact, as early as 1888 it was recognized in this state that ''Courts will interfere for the purpose of protecting property rights of members of unincorporated associations in all proper cases, and when they take jurisdiction, will follow and enforce, so far as applicable, the rules applying to incorporated bodies of the same character.'' (*Otto* v. *Journeymen Tailors' P. & B. Union*, 75 Cal. 308 [17 P. 217, 7 Am.St.Rep. 156].) It is obvious that such organizations are no longer comparable to voluntary fraternal orders or partnerships; that they are *sui generis*, and approximate corporations in their methods of operation and powers. This being so, wherever it can be done without violation of some rule of law, the ends of justice will be more properly served if the courts apply to such organizations the rules applicable to corporations rather than the rules applicable to voluntary fraternal orders or partnerships, at least at the procedural level and in respect to the conduct of the business of a court and the enforcement of its lawful orders. While there may be associations which are more similar to partnerships than to corporations, as the Venice Road Race Association was held to be in *Leake* v. *City of Venice*, 50 Cal.App. 462 [195 P. 440], the modern labor union is far more similar to a corporation than to a partnership. To consider such organizations under present day conditions as mere social or fraternal orders or partnerships is to close one's eyes to the realities now existing.

Earlier decisions interpretive of section 388 of the Code of Civil Procedure lend support to the views which we have expressed. In *Herald* v. *Glendale Lodge No. 1289*, 46 Cal.

---

*Juneau Spruce Corp.* v. *International L. & W. Union, et al.* (decided Mar. 30, 1951) (Cal.App.), an opinion written by Justice Bray. A hearing in the Supreme Court was granted on May 28, 1951.

App. 325 [189 P. 329], the court held that this section authorized the joining of an unincorporated lodge of a fraternal order as a party defendant in an action seeking an injunction restraining the lodge from serving liquor to the members at luncheons and banquets. That decision was cited with approval in *Jardine* v. *Superior Court,* 213 Cal. 301, at 317-18 [2 P.2d 756, 79 A.L.R. 291]. In the Jardine case, the Supreme Court held that section 388 authorized the joining of the Los Angeles Stock Exchange, an unincorporated association, as a party defendant, observing that "In California, the entity theory has been established by a number of decisions." (P. 309.) In *Armstrong* v. *Superior Court,* 173 Cal. 341 [159 P. 1176], it was held that section 388 authorizes the maintenance of an action against a labor union to enjoin it from certain types of picketing and that "all members of any such association having knowledge of the terms of any injunction issued therein, as well as all their officers, agents, representatives, and employees having such knowledge, are bound thereby and guilty of contempt in any willful violation thereof." (P. 342.)

In other jurisdictions, labor unions have been found amenable to judicial process. Illustrative thereof are: *Moran* v. *International Alliance, etc.,* 139 N.J.Eq. 561 [52 A.2d 531]; *United Packing House Workers of America* v. *Boynton,* 240 Ia. 212 [35 N.W.2d 881]; and *United States* v. *United Mine Workers of America,* 330 U.S. 258 [67 S.Ct. 677, 91 L.Ed. 884].

4. *Were the Acts Proscribed by the Temporary Restraining Order within the Federal Domain to the Extent of Precluding a State Court from Enjoining Their Commission?*

Petitioners claim that the trial court was without jurisdiction to restrain the commission of the acts it enjoined, for the asserted reason that Congress, by enacting the Labor Management Relations Act of 1947, regulated the same subject matter and thereby occupied the field to the exclusion of the states.

They further claim that some of the acts (picketing by boat) occurred upon navigable waters and for that reason were within the federal jurisdiction to the exclusion of the state.

■ *As to the Labor Management Relations Act of 1947* (Pub. Law 101, ch. 120, 61 Stat. 136), petitioners direct particular attention to subsection (b) of section 8 (especially subparagraphs (B) and (C) of (4) of said subsection), and section 10 of the National Labor Relations Act (of 1935),

as revised by section 101 of the Labor Management Relations Act, 1947. They also direct attention to section 303 of the 1947 act.

The Supreme Court of the United States has decided this question adversely to the position taken by the petitioners. In 1942, the question was presented to that court whether an order of the Wisconsin Employment Relations Board entered under the Wisconsin Employment Policy Act was unconstitutional and void, as being repugnant to the provisions of the National Labor Relations Act (49 Stat. 449; 29 U.S.C.A. § 151 et seq.). The state board, after a hearing held pursuant to the provisions of the state statute, found appellants guilty of certain unfair labor practices and ordered the union, its officers, agents and members to desist from mass picketing, threatening employees, obstructing or interfering with factory entrances, obstructing or interfering with free use of public streets and sidewalks, and from picketing the domiciles of employees. It was admitted that the company was subject to the federal act although the federal board had not undertaken in this case to exercise the jurisdiction which the federal act conferred upon it.

Confining its attention to the specific facts of the case before it and carefully refraining from giving consideration to any of the other and separable provisions of the state statute, the Supreme Court of the United States directed attention to the fact that the only employee or union conduct and activity forbidden by the state were, in this case, ''mass picketing, threatening employees desiring to work with physical injury or property damage, obstructing entrance to and egress from the company's factory, obstructing the streets and public roads surrounding the factory, and picketing the homes of employees. So far as the fourteen individuals are concerned, their status as employees of the company was not affected.'' (*Allen-Bradley Local* v. *Wisconsin Emp. Relations Board,* 315 U.S. 740, 748 [62 S.Ct. 820, 86 L.Ed. 1154].) The court then said, ''We agree with the statement of the United States as *amicus curiae* that the federal Act was not designed to preclude a State from enacting legislation limited to the prohibition or regulation of this type of employee or union activity.'' (P. 748.) The court distinguished its decision in *Hines* v. *Davidowitz,* 312 U.S. 52 [61 S.Ct. 399, 85 L.Ed. 581], upon the ground that the federal statute there involved provided a complete federal system of alien registration and thereby superseded any state system of alien registration, holding

that the federal labor relations act did not govern employee or union activity of the type enjoined by the Wisconsin board, adding: "And we fail to see how the inability to utilize mass picketing, threats, violence, and the other devices which were here employed impairs, dilutes, qualifies or in any respect subtracts from any of the rights guaranteed and protected by the federal Act. Nor is the freedom to engage in such conduct shown to be so essential or intimately related to a realization of the guarantees of the federal Act that its denial is an impairment of the federal policy." (P. 750.) In conclusion the Supreme Court said: "In sum, we cannot say that the mere enactment of the National Labor Relations Act, without more, excluded state regulation of the type which Wisconsin has exercised in this case. It has not been shown that any employee was deprived of rights protected or granted by the federal Act or that the status of any of them under the federal Act was impaired. Indeed, if the portions of the state Act here invoked are invalid because they conflict with the federal Act, then so long as the federal Act is on the books it is difficult to see how any State could under any circumstances regulate picketing or disorder growing out of labor disputes of companies whose business affects interstate commerce." (P. 751.)

We have found no subsequent decision of the United States Supreme Court that disapproves the decision which ·it made or the principles which it applied in the Allen-Bradley case. (See *Hill* v. *State of Florida*, 325 U.S. 538, at 539, 545 [65 S.Ct. 1373, 89 L.Ed. 1782] [concurring opin. by Mr. Chief Justice Stone], 555, 559-60 [dissenting opin. by Mr. Justice Frankfurter; *Southern Pac. Co.* v. *State of Ariz.*, 325 U.S. 761, at 776 [65 S.Ct. 1515, 89 L.Ed.·1915]; *Railway Mail Assn.* v. *Corsi*, 326 U.S. 88, at 95-96 [65 S.Ct. 1483, 89 L.Ed. 2072]; and *International Union, etc.* v. *O'Brien*, 339 U.S. 454, at 459 [70 S.Ct. 781, 94 L.Ed. 978].)

In 1949, in considering the question whether or not the Labor Management Relations Act of 1947 (including its revision of the National Labor Relations Act of 1935) precluded the Wisconsin Employment Relations Board, pursuant to the provisions of the Wisconsin Employment Peace Act, from ordering a union and others to cease and desist from instigating certain intermittent and unannounced work stoppages and otherwise interfering with production except by leaving the premises in an orderly manner for the purpose of going on strike (an order interpreted and limited by the Wisconsin

Supreme Court as forbidding individual defendants and members of the union from engaging in concerted effort to interfere with production by doing the acts instantly involved), the Supreme Court of the United States observed that ''Congress has not seen fit in either of these Acts [the 1935 and 1947 acts] to declare either a general policy or to state specific rules as to their effects on state regulation of various phases of labor relations over which the several states traditionally have exercised control.'' (*International Union U.A.W.* v. *Wisconsin Emp. Rel. Bd.*, 336 U.S. 245, at 252 [69 S.Ct. 516, 93 L.Ed. 651].) ''However, as to coercive tactics in labor controversies, we have said of the National Labor Relations Act what is equally true of the Labor Management Act of 1947, that 'Congress designedly left open an area for state control' and that 'the intention of Congress to exclude states from exerting their police power must be clearly manifested'' (p. 253, citing the Allen-Bradley case). ''We therefore turn to its legislation for evidence that Congress has clearly manifested an exclusion of the state power sought to be exercised in this case.'' (P. 253.) After reviewing the salient features of the 1947 act (including section 8(b)(4)), the court concluded: ''It seems to us clear that this case falls within the rule announced in Allen-Bradley that the state may police these strike activities as it could police the strike activities there, because 'Congress has not made such employee and union conduct as is involved in this case subject to regulation by the federal Board.' There is no existing or possible conflict or overlapping between the authority of the Federal and State Boards, because the Federal Board has no authority either to investigate, approve or forbid the union conduct in question. This conduct is governable by the state or it is entirely ungoverned.'' (P. 254.) With reference to the ''right to strike'' mentioned in section 13 of the revised 1935 act, the court said that this recognition of the right to strike plainly contemplates a lawful strike, the exercise of the unquestioned right to quit work and did ''not operate to legalize the sit-down strike, which state law made illegal and state authorities punished.'' In addition, the court gave particular consideration to the provisions of sections 7 and 10(a) of the federal act. In conclusion, the court said, ''We find no basis for denying to Wisconsin the power, in governing her internal affairs, to regulate a course of conduct neither made a right under federal law nor a violation of it and which has the coercive effect obvious in this device.'' (P. 265.)

In February, 1951, the Supreme Court declared invalid provisions of the Wisconsin Public Utility Anti-Strike Law which prohibited strikes against public utilities and provided for compulsory arbitration of labor disputes after an impasse in collective bargaining had been reached. (*Amalgamated Assn. of S., E. R. & M. C. Emp. of America* v. *Wisconsin Emp. Rel. Bd.,* —— U.S. —— [71 S.Ct. 359, 95 L.Ed. ——].) The court found those provisions in conflict with the National Labor Relations Act of 1935, as amended by the Labor Management Relations Act of 1947. Such provisions, if effective, would operate to restrain the exercise of rights protected by section 7 of the federal act. We find nothing in that decision which disallows or overrules in any way the holding which the same court made in the Allen-Bradley and International Union cases. The judgments of contempt here under review were rendered to enforce the observance of provisions of an injunction which forbade picketing by means of acts of violence, entirely different from an attempted restraint of the exercise of the right to call a strike and conduct it peacefully.

■ *The picketing by boat occurred upon navigable waters.* Because of this fact petitioners claim that such picketing was within the exclusive jurisdiction of the federal courts and therefore beyond the jurisdiction of a state court. This point is not well taken.

The picket boats were within the territorial waters of the state. A state has policing jurisdiction over its territorial waters, a jurisdiction that may be exercised by a state for all proper purposes. (*People* v. *Stralla,* 14 Cal.2d 617 [96 P.2d 941].) The Judiciary Act of 1789 and later statutes reenacting its pertinent provisions, in declaring that federal district courts have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, placed a limitation upon that exclusive feature by ''saving to suitors in all cases the right of a common-law remedy where the common law is competent to give it . . .'' (28 U.S.C.A. § 41, subd. 3, and § 371.) This clause was interpreted in *Moore* v. *Purse Seine Net,* 18 Cal.2d 835, at 837 [118 P.2d 1], as meaning that ''a case involving a maritime cause of action may properly be brought in a state court if the type of remedy pursued is traditionally within the jurisdiction of the common law courts.'' The court concluded that ''If the action is of a type that was cognizable in both admiralty and common law courts the state courts retain a concurrent jurisdiction with the fed-

eral admiralty courts to entertain the action.'' (P. 837.) The Moore case was affirmed in *C. J. Hendry Co.* v. *Moore,* 318 U.S. 133 [63 S.Ct. 499, 87 L.Ed. 663]. Those decisions leave no doubt that even if the boat picketing involved herein were a civil case of admiralty or maritime jurisdiction, the trial court under the saving clause quoted had jurisdiction of the subject matter thereof.

This saving clause was modified and enlarged by the 1948 revision of title 28 of the United States Code. The saving clause became a part of section 1333, which declared that the federal district courts have original jurisdiction exclusive of the courts of the states of ''Any civil case of admiralty or maritime jurisdiction, saving to the libellant or petitioner in every case any other remedy to which he is otherwise entitled.'' (Pub. Law 773, 80th Congr. 2d Sess., ch. 646; U.S. Code Congr. Serv. 1948, p. A3, at A84.) In this form the saving clause became effective September 1, 1948 (Pub. Law 773, § 38, ch. 646; U.S. Code Congr. Serv. 1948, p. A164), prior to the filing of the action and commencement of the contempt proceedings in the court below. In that form the saving clause continued in effect until section 1333 was amended in 1949 to read ''saving to suitors in all cases all other remedies to which they are otherwise entitled.'' (Pub. Law 72, 81st Congr. 1st Sess., ch. 139; U.S. Code Congr. Serv. 1949, p. 109.)

Petitioners also invoke sections 526 to 526t, inclusive, of title 46 of the United States Code as a statute through the medium of which the federal government has asserted and exercises exclusive jurisdiction over every vessel propelled by machinery and not more than 65 feet in length, except tugboats and towboats propelled by steam. The fact that the picket boats in question were propelled by outboard motors would probably bring them within the scope of the regulatory provisions of the statute cited. However, that statute relates only to the boat (requiring that it be equipped with lights, a whistle, a life preserver and other safety devices) and prohibits its operation in a reckless or negligent manner so as to endanger the life, limb or property of any person. In enacting that statute the Congress certainly did not assert exclusive federal jurisdiction, or any jurisdiction, over the types of conduct which the trial court in its judgments here under review found and declared constituted contempt of court.

A complete answer to this contention of petitioners is the fact that the transaction under consideration is not a cause of admiralty or maritime jurisdiction. What certain of the petitioners did in the picket boats took effect on land. It has long since been established that for a tort to be maritime the alleged injury to person or property must be consummated on or in navigable waters, and not on land. (See *Ex parte Phenix Ins. Co.*, 118 U.S. 610 [7 S.Ct. 25, 30 L.Ed. 274] ; *Johnson* v. *Chicago & P. Elevator Co.*, 119 U.S. 388 [7 S.Ct. 254, 30 L.Ed. 447] ; *Cleveland Terminal & V. R. Co.* v. *Cleveland Steamship Co.*, 208 U.S. 316 [28 S.Ct. 414, 52 L.Ed. 508] ; *The Raithmoor*, 241 U.S. 166, 173-175 [36 S.Ct. 514, 60 L.Ed. 973].) The same principle applies to the disobedience of a court order when it takes effect on land, as in the case here under review.

5. *As to the Use of Documents Produced in Court in Response to Subpoenas Duces Tecum, Assertedly Based upon Insufficient Affidavits.*

Petitioners claim that the trial court lost jurisdiction to render judgment because, as they say, certain documents were produced in court and introduced into evidence in response to subpoenas duces tecum, based upon an affidavit therefor which petitioners claim was insufficient to furnish a basis for such an order. In this connection, they claim that their constitutional immunity from unlawful search and seizure was violated, rendering the use of the documents incompetent and the entire proceeding void.

The documents in question were in the possession or in the control of the Local Union. The subpoenas were addressed to the appropriate officers of the union requiring production of the documents, which consisted of the constitution and by-laws of the International Union; the minutes and minute books of the Local and its members, of meetings on certain specified dates in September, October and November, 1948, and of all special meetings of the Local held during that period; each issue of the publication "Off Stream" distributed by the strike committee of the Local from September 4 through September 26, 1948; all of the records of the Local showing the persons who were members of the International and of the Local from September 13 through November 22, 1948; the list of all members of the Local who picketed the Oleum refinery of the Union Oil Company; the time and dates of picketing duty assigned to and credited to each such picket; the dates and hours of picketing duty performed by each

member of the Local who picketed the refinery; and the assignments of the pickets to the refinery on September 15, 16, 17, 22, 24, 28, and October 4, 1948, the days upon which the complaints before the trial court severally alleged disobedience of the restraining order occurred.

During the trial, petitioners moved to quash the service of most, if not all, of these subpoenas, which motions were denied. These documents were brought into court and, when called for, objections to their use as evidence were made by petitioners, and overruled. The documents, or pertinent portions of them, then went into evidence. The record of the minutes of the meetings of the Local was submitted to the trial judge, who selected from them those portions only which he considered relevant to the issues before the court, whereupon those portions only were read into evidence.

The question whether or not the order directing the issuance of these subpoenas had a sufficient foundation in the facts stated in the affidavit which accompanied the application for that order is not a question for consideration and determination by this court in this proceeding. Our inquiry is limited to the question of jurisdiction. The manner of the production of these documents which went into evidence did not affect the jurisdiction of the trial court to render judgment. In *Selig Cahn, Inc.* v. *California Wrecking Co.*, 9 Cal. 2d 617 [71 P.2d 1113], on appeal from a judgment rendered in a civil action the appellant complained that "the trial court by an order made without authority compelled it to produce certain of its books and records upon the trial." (P. 619.) In response to that contention the Supreme Court ruled that "The remedy of the appellant, if it wished to resist the order, was by appropriate proceedings for that purpose. It could not comply with the order and then object to the introduction of the records which it produced upon the ground that the order was improper. (*People* v. *Mayen,* 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383].)" In the Mayen case, on an appeal from a judgment of conviction of grand larceny and of attempted grand larceny, the appellant assigned as error the use of certain photographs, letters and other papers assertedly taken from appellant's place of residence under color of a search warrant based upon an insufficient affidavit. During the trial, and prior to the use of these papers, appellant moved for an order requiring the district attorney to return the papers to him, a motion which the court denied. Later, when certain of the papers were offered in evidence, appellant

objected to their reception upon the grounds upon which he had made the motion for their return, but the objection was overruled and various of the documents were admitted in evidence. The Supreme Court held that where competent evidence is produced on a trial, the courts, under the law of this state, may not stop to inquire or investigate the source from which it comes or the means by which it was obtained. A proceeding for the recovery of property unlawfully seized, said the court, is independent of the criminal proceeding in which it is sought to use such article in evidence. As stated later in *People* v. *Gonzales,* 20 Cal.2d 165, at 169 [124 P.2d 44], "the accepted rule in this state, as in many others, permits the introduction of improperly obtained evidence on the ground that the illegality of the search and seizure does not affect the admissibility of the evidence."

6. *As to the Denial of Petitioners' Motion for a Continuance to Enable Their Counsel to Prepare for and Present Oral Argument.*

 Upon the conclusion of the taking of evidence in the afternoon of December 31, 1948, counsel for petitioners indicated a desire for oral argument. The court said, "You want to make it, well, start in right now." Counsel stated he could not start in right then because of the size of the transcript. After some discussion, the court again said to counsel, "If you want to argue it today, I will be glad to hear you." Counsel responded that he could not argue it that day. The court ruled that it would not keep this matter open longer because the court was going to try to give prompt decision, that the court owed it to the many alleged contemnors to make a prompt decision. Counsel then asked and was granted permission to file an affidavit in support of his motion for a continuance for the purpose of argument, a continuance pursuant to section 595 of the Code of Civil Procedure, predicated upon the fact that counsel had been elected to the Legislature, which would convene at Sacramento January 3, 1949, and continue in session for approximately four weeks. The affidavit stated that counsel had been elected a member of the state Legislature which would convene on January 3, 1949, at Sacramento; that it was therefore necessary for him to attend the session and that he did not consent to the trial or hearing of any proceedings then before the court before the expiration of 30 days next following final adjournment, or the commencement of a legislative recess of more than 35 days. As it turned out, the state Legislature convened on

January 3, 1949; recessed on January 29, reconvened on March 7, and continued in session until adjournment on July 2, 1949.

The statute invoked (§ 595) was not available to counsel at the time. It applies only when a party or an attorney of record is a member of the Legislature and objects to proceeding with a trial or hearing, and does not then apply unless the Legislature be in session or in a recess not exceeding 35 days. On that day, counsel was not a member nor was the Legislature in session or in recess.

Petitioners do not now assert a right under section 595. They claim that denial of the motion operated to deprive them of the right of representation by counsel, a denial of due process. We do not so view it. Oral argument in a civil proceeding tried before the court without a jury, is a privilege, not a right, which is accorded the parties by the court in its discretion. Here the court did accord that privilege, but petitioners sought instead a postponement of long duration (not less than 30 days in any event) in a type of proceeding which the law requires shall go ahead to a conclusion with all reasonable expedition. In addition, the record shows that during the course of the trial the court entertained and received the benefit of the expression of the views of counsel at every stage. Denial of the motion in no way impaired the jurisdiction of the court to proceed.

7. *The Propriety of the Joinder of Union Oil Company as a Party Respondent in this Proceeding.*

The petitioners joined Union Oil Company of California as a party respondent when they applied for the writ of review. In their briefs they claim that the company is not a real party in interest nor a party whose interest would be directly affected by this proceeding; therefore, not a proper party. They urge that this proceeding be dismissed as to the company. The company, upon the other hand, claims it is a proper party and was appropriately joined as a respondent.

The burden of petitioners' argument is that a contempt proceeding is criminal in nature and that a criminal proceeding must be prosecuted by the authority of the People of the state and not by a private person. That argument would be sound if this were strictly a criminal proceeding, which it is not. The company, as a person for whose protection the temporary restraining order was granted, would be a "party beneficially interested" and thus qualified under

section 1069 of the Code of Civil Procedure to apply to an appellate court for a writ of review, if the trial court had dismissed the contempt proceeding upon the ground that the temporary restraining order was invalid for some reason and the company desired to test the jurisdiction of the court to make the order of dismissal. (*Taylor* v. *Superior Court,* 20 Cal.2d 244, 247 [125 P.2d 1].) In *Sheldon* v. *Superior Court,* 42 Cal.App.2d 406 [108 P.2d 945], it was held that in a proceeding to review an order removing a special administrator and appointing another in his stead, the latter is a real person in interest and therefore a proper party respondent. These principles demonstrate the propriety of petitioners having joined the company as a party respondent herein.

As a corollary to this phase of their argument, petitioners in their answering brief make the suggestion that it was improper to permit the attorneys for the plaintiff in the action to prosecute the contempt proceeding, i.e., that ''the prosecution of this case by the attorneys representing a partisan party in the case in chief cannot be permitted,'' and that ''it is highly improper and prejudicial for them so to do.'' It is not clear that petitioners claim that such prosecution deprived the court of jurisdiction to enter judgment. We entertain no doubt that it did not.

■ In a brief filed by amicus curiae the additional point is made that it is against public policy to permit the prosecution of a contempt proceeding by private individuals without the consent or cooperation of the district attorney. We find this point to be without merit, upon the authority of *Taylor* v. *Superior Court, supra,* 20 Cal.2d 244, and cases collected in 5 California Jurisprudence 936, Contempt, section 35.

The order under review is hereby affirmed in every respect and as to all of its provisions, save and except only the following provisions, which are hereby annulled: (1) The provisions of said order which adjudged the Local Union, the International Union, and Frank M. Silva guilty of contempt for acts done September 27, 1948, as alleged in the affidavit of Robert C. Diehl which was filed October 14, 1948; (2) the provisions of said order which adjudged the Local Union, the International Union, Frank M. Casey, James P. Kenny, Herman Phillips, Jr., Frank M. Silva, Montell H. Bullock, Curtis C. Page, and Walter V. Holt guilty of contempt for acts done September 28, 1948, as alleged in the affidavit of G. H. Hemmen which was filed October 14, 1948; and (3) the provisions of said order which adjudged Montell H. Bullock

guilty of contempt for acts done October 4, 1948, as alleged in the affidavit of Donald Ritchey, which was filed October 14, 1948.

Bray, J., concurred.

PETERS, P. J.—I concur and dissent.

Except in one particular, I concur with everything that is said and decided in the majority opinion. That opinion fully and fairly states the facts, and, except in this one respect, correctly applies the law to those facts. I disagree with the majority only with their disposition of the contempt order against Frank M. Silva based upon the Briggs complaint. It is my opinion that there is no evidence to support the finding that Silva had notice of the restraining order when these acts were committed, and therefore did not violate the restraining order.

The Briggs complaint charged Silva and others with certain acts in violation of the restraining order alleged to have been committed on September 22, 1948. I have no doubt at all that the evidence supports the finding that Silva committed the charged acts. The evidence recited in the majority opinion demonstrates that to a certainty. The question is whether the evidence supports the finding that Silva knew of the provisions of the order when the acts were committed. This element of proof was indispensable. The burden of proof rested on those asserting knowledge to prove it.

The majority concede that there is no direct evidence of knowledge on the part of Silva on or before September 22, 1948, but hold that the trial court indulged in a reasonable inference that Silva then had knowledge on that date. This inference is based upon the following facts:

1. When directly asked if he knew of the restraining order on September 22, 1948, Silva testified that he did not, and that he did not gain such knowledge until October 6th or 7th when first told by a deputy sheriff. Earlier in the trial he had testified as to certain events which occurred on September 15th. During that testimony, when asked if he had knowledge of the injunction on September 15th—and no other date was then involved—he testified that he then did not have such knowledge, but that later he found out from a deputy sheriff, who told him about the injunction "and that was, say, about, I should say, maybe a week or so after this happened, maybe; I am not sure now." When confronted

with this testimony after he had testified that he did not have such knowledge on the 22d, he testified: "You must remember I said I wasn't sure what time it was—might be a week, might be two weeks, might be three weeks."

This is treated by the majority as an admission from which the trial court could reasonably infer that Silva had the requisite knowledge on September 22d, a week to the day after September 15th. This evidence cannot be distorted into an admission that Silva had knowledge on the 22d. This case is *quasi* criminal in character, and the burden of proof is on those asserting knowledge. At best, the quoted evidence supports a guess, surmise or conjecture that Silva might have had the requsite knowledge on the 22d, but no reasonable inference to that effect can be predicated thereon.

2. Considerable weight is given in the majority opinion to the evidence that small placards setting forth the terms of the restraining order were posted at each entrance, and that Silva admittedly, prior to the 22d, picketed near various entrances to the plant. A guess is made that he may have seen the notices. The majority state that it taxes "human credulity" to believe that Silva did not read the signs because he had the opportunity to read them. He testified that he did not read them, and there is no contradiction of his testimony. Even if his testimony was disbelieved by the trial court, as it apparently was, is mere opportunity to acquire knowledge to be substituted for proof of knowledge, where that element of proof is essential? Does proof of opportunity meet the burden of proof? I think not.

3. In the statement of facts relating to the acts committed by Silva great emphasis is laid upon the evidence that Silva knew Casey, a union official who knew of the restraining order, and that Silva was frequently seen in Casey's company prior to the 22d. It is implied, apparently, that Casey must have told Silva about the restraining order and that Silva must have learned of it in this fashion. If this is the proper interpretation of the majority opinion, the conclusion reached is certainly not sound. Again, proof of opportunity of acquiring knowledge cannot be substituted for proof of knowledge. This is carrying the concept of guilt by association far beyond permissible limits.

Whether these bits of evidence be considered separately or together they furnish no logical or reasonable basis for the inference that Silva knew of the provisions of the restraining

order on the 22d. The majority, in my opinion, have indulged in mere guess, surmise and conjecture on this issue.

The majority opinion sets forth at length the evidence showing that Silva committed several of the prohibited acts. Undoubtedly, he committed those acts. Undoubtedly, he committed acts that not only violated the restraining order, but constituted violations of the criminal law. They were bad acts and wrongful acts. But he is not charged with simply committing those acts. He is charged with violating the terms of a restraining order. He cannot be held to have violated the restraining order unless he knew of it. This is the key issue. In my opinion, those asserting such knowledge failed to prove it. This portion of the order should be annulled.

In all other respects I agree with the majority opinion.